IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Nina Y. Wang**

Criminal Action No. 24-cr-00083-NYW-1

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                              **Level 1 Restricted**

1.    DYLAN ANDREW MILLER,

    Defendant.

_____

## ORDER ON PRETRIAL EVIDENTIARY MOTIONS

_____

Defendant Dylan Andrew Miller ("Defendant" or "Mr. Miller"), a former Loveland Police Department officer, is charged with one count of deprivation of rights under color of law in violation of 18 U.S.C. §§ 242 and 250(a), (b)(1) based on an allegedly sexual assault of a minor while on duty. [Doc. 1]. Mr. Miller moves to suppress a wide range of evidence. [Doc. 34; Doc. 35; Doc. 36]. The United States (or the "Government") has also moved to exclude certain evidence under Federal Rule of Evidence 412, [Doc. 28], and moved to introduce certain evidence under Federal Rule of Evidence 404(b), [Doc. 31].

## BACKGROUND

The Government alleges[1] that around midnight on the night of August 3, 2024 into August 4, 2024, Mr. Miller sexually assaulted a minor ("Minor #1")[2] in North Lake Park in

_____

[1] In this Order, the Court sets forth the facts of the alleged assault for contextual purposes only. These allegations form the basis of the charge and are obviously in dispute. The allegations were not the subject of the Court's evidentiary hearing and the Court makes no factual findings with respect to these allegations or the underlying charged conduct.

[2] The Court refers to all minors using pseudonyms, consistent with the Parties' practice.

Loveland, Colorado while on duty as a Loveland Police Department ("LPD") officer.  [Doc. 28 at 1].

*The Report.*   Minor #1 reported a sexual assault by an LPD officer to law enforcement on October 23, 2023.  [Hearing Tr. at 99:10–14].[3]  During a forensic interview conducted on October 26, 2023, Minor #1 recounted that the officer approached her and a friend ("Minor #2") at North Lake Park and that Defendant instructed Minor #2 to leave.  [*Id.* at 101:2–25, 102:3–11].  The officer then spoke to Minor #1 for about an hour before moving them to a different area of the park.  [*Id.* at 102:11–13].  He also moved his patrol car to face away from where they were sitting, and when he returned, he had removed his body-worn camera and nameplate.  [*Id.* at 104:14–23].  The officer asked Minor #1 "what they could do" to address her curfew violation and "told her that everything verbal was going to be off the table."  [*Id.* at 102:13–17].  He then assaulted Minor #1 by, inter alia, forcing her to perform oral sex on him.  [*Id.* at 102:18–21, 105:20–106:5].

*The Investigation.*   The LPD referred the investigation into Minor #1's report to the Larimer County Sheriff's Office ("LCSO"), and the LCSO initiated a criminal investigation.  [*Id.* at 47:13–48:5, 98:24–99:9, 100:9–12].  LCSO Sergeant Rita Servin ("Sergeant Servin") was assigned as lead investigator.  [*Id.* at 100:2–8].  Sergeant Servin observed the October 26 forensic interview of Minor #1 from another room, [*id.* at 101:16–18, 102:1–2], and on the same day interviewed Minor #2, who corroborated Minor #1's account of the park encounter and indicated that Minor #1 had texted him the next morning indicating she had been touched by a Loveland police officer, [*id.* at 111:1–17].

---

[3] The Court cites to a preliminary nonpublic version of the evidentiary hearing transcript. Accordingly, there may be some variations with respect to page numbers, line numbers, or specific language should an official transcript be ordered and prepared.

She pulled the GPS location data from Mr. Miller's mobile data terminal ("MDT"), which is a laptop mounted in his patrol car, and confirmed that he was at North Lake Park in the early morning hours of August 4, 2023. [*Id.* at 69:4–11, 140:8–141:10, Doc. 35-1 at 08:46:33–40]. Sergeant Servin also conducted a photo lineup using 98 male LPD officers' photos, during which Minor #1 identified Defendant as the assailant. [Hearing Tr. at 109:10–110:19]. Moreover, Sergeant Servin learned that days before the alleged assault, Defendant had pulled over a car full of minors, including Minor #1; had followed the car as it dropped each minor off at their home; and had spoken to Minor #1 outside of her home. [*Id.* at 108:4–109:9].

LPD officials decided to place Mr. Miller on administrative leave. [*Id.* at 8:4–10]. On October 27, 2023, Lieutenant Jeffrey Pyle ("Lieutenant Pyle") met Defendant as he arrived at the LPD station, told him that LPD Assistant Chief Mike Trombley ("Assistant Chief Trombley") needed to speak with him, and walked with him to the Assistant Chief Trombley's office. [*Id.* at 16:6–14]. There, Assistant Chief Trombley informed Mr. Miller that there was a serious allegation of sexual misconduct against Defendant and that Defendant would be placed on administrative leave pending LCSO's investigation. [*Id.* at 17:2–7]. Assistant Chief Trombley and Lieutenant Pyle took Mr. Miller's weapons and his work phone and Lieutenant Pyle placed them in a closet in Assistant Chief Trombley's office. [*Id.* at 17:19–18:2]. Assistant Chief Trombley told Mr. Miller that LCSO officials were in the building and were available to speak with him if he wished; Mr. Miller said he would speak with them. [*Id.* at 18:17–19:9].

Sergeant Servin and Sergeant Kevin Maul ("Sergeant Maul") of the LCSO met Defendant in an LPD conference room and asked if he would be willing to talk with them.

[*Id.* at 114:14–20, 116:9–14; Doc. 35-1 at 07:57:33–58:44]. They explained that they would bring him to an LCSO substation to conduct the interview to "have some privacy." [Doc. 35-1 at 7:58:12–44]. He said he would be willing to talk to them, and after driving to the LCSO substation—which took approximately five minutes—Sergeant Servin interviewed Defendant for about 50 minutes which was all recorded on an Axon camera. [*Id.* at 08:00:59–01:05, 08:04:02–08:09:22, 08:11:32–09:00:05]. Defendant was not given *Miranda*[4] or *Garrity*[5] warnings at the start of the interview. [*Id.* at 08:11:42–08:13:05]. At the end of the interview, Sergeant Servin seized Defendant's personal and work cellphones. [*Id.* at 09:00:48–01:14; Hearing Tr. at 122:22–123:6]. The Government eventually obtained warrants to search the phones, among other devices. *See, e.g.*, [Doc. 36-5; Doc. 36-6; Doc. 36-10].

***The Pending Motions.*** The Parties have filed a number of pretrial Motions: (1) the United States' Motion to Exclude Evidence of Minor #1's Other Sexual Behavior Under Federal Rule of Evidence 412 (the "Rule 412 Motion"), [Doc. 28]; (2) the United States' Notice and Motion to Introduce Evidence Under Federal Rule of Evidence 404(b) (the "Rule 404(b) Motion"), [Doc. 31]; (3) Defendant's Motion to Exclude and Suppress All Privileged Communications and for a Forthwith Hearing (the "Motion to Suppress Marital Communications"), [Doc. 34]; (4) Defendant's Motion to Suppress Statements Obtained in Violation of Mr. Miller's Fifth Amendment Rights (the "Motion to Suppress Under the Fifth Amendment"), [Doc. 35], and (5) Defendant's Motion to Suppress

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] *Garrity v. New Jersey*, 385 U.S. 493 (1967).

Evidence Obtained in Vioaltion [sic] of the Fourth Amendment and Request for a Forthwith Hearing (the "Motion to Suppress Under the Fourth Amendment"), [Doc. 36].

On April 14, 2025, the Court held a limited evidentiary hearing and oral argument on three issues: (1) Defendant's expectation of privacy in his phones, (2) whether exigent circumstances permitted the Government's seizure of the phones, and (3) whether Mr. Miller was in custody during Sergeant Servin's interview, whether the interview was criminally focused or had a civil component, and whether Defendant's *Miranda* rights were violated.  *See* [Doc. 71; Doc. 89].

## I.    Rule 412 Motion

### A.    Legal Standard

"In sexual-offense cases, evidence of the victim's sexual behavior is generally inadmissible."  *United States v. Willis*, 826 F.3d 1265, 1277 (10th Cir. 2016).  Rule 412 of the Federal Rules of Evidence provides that "evidence offered to prove that a victim engaged in other sexual behavior" and "evidence offered to prove a victim's sexual predisposition" are "not admissible in a . . . criminal proceeding involving alleged sexual misconduct."  Fed. R. Evid. 412(a).  An exception to this general rule of inadmissibility exists if exclusion of the evidence "would violate the defendant's constitutional rights." Fed. R. Evid. 412(b)(1)(C).

The rule also establishes a "procedure to determine admissibility" of this evidence. Fed. R. Evid. 412(c) (capitalization altered).  If a party intends to offer evidence under Rule 412(b), the proponent of the evidence must (1) "file a motion that specifically describes the evidence and states the purpose for which it is to be offered;" (2) file that motion "at least 14 days before trial unless the court, for good cause, sets a different

time"; (3) "serve the motion on all parties"; and (4) "notify the victim or, when appropriate, the victim's guardian or representative."  Fed. R. Evid. 412(c)(1).  "Before admitting evidence under this rule, the court must conduct an in camera hearing and give the victim and parties a right to attend and be heard."  Fed. R. Evid. 412(c)(2).

###    B.    Analysis

The Government seeks to exclude "evidence of and reference to Minor #1's sexual behavior and sexual predisposition."  [Doc. 28 at 4].  The Government acknowledges that Defendant has not affirmatively moved under Rule 412 to admit any such evidence, but states that its Motion was filed "out of an abundance of caution due to the age of Minor #1 and the nature of the case and charge."  [*Id.* at 4 n.1].  Defendant raises a few arguments in response.  He first challenges the Government's lack of specificity with respect to the particular evidence it believes falls within Rule 412's reach.  [Doc. 45 at 2].  Based on this lack of specificity, he argues that the Court should "[o]rder the government to produce a log of text and/or social media messages," "[r]eserve ruling on these issues until after" the Government has produced that log, and "[r]eserve ruling on the ultimate admissibility of such evidence under any rule of evidence, until right before trial and/or after Minor #1 has testified at trial."  [*Id.* at 1].  He argues that discovery in this case is "voluminous" and that, without a log of the potential Rule 412 evidence, he cannot raise adequate arguments about the admissibility of the evidence.  [*Id.* at 5–6].  He also "provides notice pursuant to [Rule 412] that the defense may move to admit such evidence if the Court finds that Rule 412 applies."  [*Id.* at 1].

Defendant's request that the Court order the Government to produce a log of evidence that it believes may fall within Rule 412's purview is not supported by any legal

authority and is not properly before the Court.  *See* D.C.COLO.LCrR 12.2 ("A motion shall not be included in a response or reply to the original motion.  A motion shall be filed as a separate document.").  It is Defendant's duty to identify evidence he seeks to admit under Rule 412(b) and file an affirmative motion addressing the admissibility of that evidence—it is not the Government's duty to identify that evidence within "voluminous discovery" for Defendant.  Fed. R. Evid. 412(c)(1).  The Court will, therefore, not order the Government to produce any such evidentiary log to Defendant.  Similarly, to the extent Defendant asserts that the Court "must decide whether Rule 412 applies in the first place" and suggests that he may file a Rule 412 motion "if the Court determines Rule 412 applies to this evidence," [Doc. 45 at 4, 6], Defendant is not entitled to a ruling as to Rule 412's applicability to unidentified evidence prior to a formal motion from the proponent of the evidence—Mr. Miller.  If Defendant seeks a Court ruling about Rule 412's applicability, he may file a formal motion under the Federal Rules.

Accordingly, the Rule 412 Motion is **GRANTED in part**.  The Motion is granted in the sense that the Court affirms that, under Rule 412, evidence of Minor #1's other sexual behavior or sexual predisposition is presumptively inadmissible at trial.  Fed. R. Evid. 412(a); *cf. United States v. Carmona*, No. 18-cr-10064-JWB, 2019 WL 414970, at *1 (D. Kan. Feb. 1, 2019) (granting government's motion to exclude under Rule 412 where the defendant had not filed a motion of intent to offer such evidence).  To the extent Defendant wishes to offer any such evidence, he must comply with the requirements of Rule 412.  The Government's Rule 412 Motion is respectfully **DENIED** to the extent it could be construed as requesting a definitive ruling on the admissibility of any particular evidence,

given that Defendant has not moved to admit any such evidence.  The Court will make specific evidentiary rulings if and when Defendant files a Rule 412 motion.

## II.    Rule 404(b) Motion

The Government states that it intends to introduce at trial evidence of Defendant's prior interactions with Minor #1.  [Doc. 31 at 1].  Specifically, the Government seeks to introduce evidence of three events:  (1) that on July 27, 2023, Defendant pulled over a car of minors, including Minor #1, and spoke directly to Minor #1 outside of her home, [*id.* at 4]; (2) that on or about August 13, 2023, Defendant allegedly followed Minor #1 when she was a passenger in a vehicle, caused the vehicle to pull over, and asked Minor #1 if he "needed to talk" to her, [*id.* at 5]; and (3) that on August 14, 2023, Minor #1 allegedly observed Defendant's personal vehicle driving by her softball practice, [*id.* at 5–6].  The Government first asserts that this evidence is inextricably intertwined with the charged conduct, such that it is non-Rule 404(b), admissible evidence.  [*Id.* at 6].  Alternatively, the Government moves to introduce the evidence under Rule 404(b).  [*Id.* at 6–7].

### A.    Legal Standard

Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Such evidence is admissible, however, if it is offered for "another purpose," like "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  To determine whether evidence is admissible under Rule 404(b), courts employ a four-part test:

(1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of

whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

*United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000) (quotation omitted).

"Rule 404(b) only applies to evidence of acts extrinsic to the charged crime." *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993) (quotation omitted). Extrinsic evidence is evidence "not intimately connected or blended with the factual circumstances of the charged offense." *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009) (quotation omitted). Intrinsic evidence, on the other hand, is evidence "directly connected to the factual circumstances of the crime and provides contextual or background information to the jury." *Id.* (quotation omitted). "Other act evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *Lambert*, 995 F.2d at 1007 (quotation omitted). While intrinsic evidence is not subject to Rule 404(b), it may still be excluded under Rule 403. *United States v. Hall*, 508 F. App'x 776, 780 (10th Cir. 2013).

### B.    Analysis

The Government argues that the July 2023 traffic stop and subsequent interaction is intrinsic evidence because the jury would not fully understand Minor #1's perspective and testimony about the alleged assault without knowing that Defendant had allegedly pulled Minor #1 over, followed her home, and talked to her in her driveway. [Doc. 31 at 7–8]. It further contends that the July 2023 traffic stop provides important context to Minor #2's perspective and testimony about the night of the alleged assault and why he left

Minor #1 alone with Defendant that night. [*Id.* at 8]. It also contends that the pre-incident interaction "shows that [Defendant] acted willfully, intentionally isolating Minor[ ]#1 from Minor #2 before sexually assaulting her." [*Id.*]. As for the post-assault interactions, the Government says that these interactions provide important context to Minor #1's delay in reporting the alleged assault and, without this evidence, the jury will be unable to fully understand Minor #1's decision. [*Id.*].

Defendant responds first that the July 2023 traffic stop is not intrinsic evidence because it was a lawful traffic stop and Minor #1 was not the driver, such that the stop "does not directly connect to the factual circumstance of an alleged isolated sexual assault occurring . . . on August 4, 2023." [Doc. 44 at 5]. He argues that whether he knew Minor #1 before the alleged assault "is not a precondition for charging" him, [*id.*], and whether he had a prior interaction with Minor #1 "does not give context as to why he would . . . assault Minor #1 on August 4, 2023." [*Id.* at 6–7]. As for the post-assault interactions, Defendant offers no specific argument as to why this evidence is not intrinsic, arguing only that the "legal reasonings" asserted with respect to the July 2023 traffic stop "are equally applicable to the alleged events" in August 2023. [*Id.* at 7].[6]

The Court concludes that the July 2023 traffic stop and subsequent interaction at Minor #1's home, the August 13 interaction, and the August 14 spotting of Defendant's vehicle at Minor #1's softball practice are intrinsic to the factual circumstances surrounding the charged conduct. "Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to

---

[6] To the extent Defendant attacks the strength of the evidence, *see, e.g.*, [Doc. 44 at 7 n.7], the Court finds that this argument is more properly directed to the jury.

the charged offense, . . . forms an integral part of the witness's testimony, or completes the story of the charged offense." *United States v. Brooks*, 535 F. Supp. 3d 1144, 1148 (W.D. Okla. 2021) (quoting *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000)).  If "a witness's testimony would [be] confusing and incomplete without mention of the prior act," then that evidence may be intrinsic to the charged crime. *United States v. Gallegos*, 111 F.4th 1068, 1092 (10th Cir. 2024) (quotation omitted).

Evidence that Defendant encountered Minor #1 and Minor #2, spoke directly to Minor #1, and wrote her name down in a notebook a mere week before the alleged assault provides context or background information to Minor #1's and Minor #2's testimony about the night of the alleged assault, including but not limited to why Minor #2 left Minor #1 alone with Defendant in the park.   Indeed, Defendant himself asserts that "[t]his is a classic he/said, she/said case," [Doc. 45 at 3], and this evidence provides context relevant to the jury's determination of witness credibility, *see United States v. Tony*, No. 16-cr-02904-MV, 2022 WL 594882, at *4 (D.N.M. Feb. 28, 2022) (concluding that evidence was intrinsic where it "[bore] on the jury's ability to evaluate [the defendant's] credibility"); *cf. United States v. Graziano*, 558 F. Supp. 2d 304, 320 (E.D.N.Y. 2008) (evidence that arson defendant had previously communicated with and threatened the victims was inextricably intertwined with the charged crime).   While Defendant's knowledge of Minor #1 may not be a "precondition" for the charge, [Doc. 44 at 5], the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has "never required that the other-act evidence establish an element of the charged offense," *United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011).

The Court also agrees with the Government that the alleged incidents from August 2023 provide important context as to why Minor #1 may have delayed reporting the alleged assault.  *Cf. United States v. Smith*, No. 19-cr-00324-BAH, 2020 WL 5995100, at *14 (D.D.C. Oct. 9, 2020) (in Rule 403 analysis, finding that "[e]vidence that helps explain" the alleged victim's delay in reporting abuse was "relevant to the veracity of [the victim's] claims and thus highly probative").  Moreover, Defendant's alleged acts of seeking out Minor #1 and asking her if they needed to talk or appearing at her softball practice—soon after the alleged assault—could suggest consciousness of guilt, which provides further support for the Court's conclusion that these post-incident interactions are intrinsic to the charged conduct.  *See United States v. Cushing*, 10 F.4th 1055, 1077 (10th Cir. 2021) (concluding that evidence "supported [the defendant's] guilty conscience and [was] thus intrinsic to the charged crime"); *United States v. Hari*, No. 18-cr-00150-DWF-HB, 2020 WL 3790742, at *4 (D. Minn. July 7, 2020) (evidence relevant to the issue of consciousness of guilt was intrinsic evidence).  The August 2023 events are thus intrinsic to the charged conduct, too.  As a result, Rule 404(b) does not apply to this evidence.[7]

The Court still must evaluate whether the evidence is admissible under Rule 403. *United States v. Piette*, 45 F.4th 1142, 1156 (10th Cir. 2022).  Rule 403 provides that a court may exclude evidence if "if its probative value is substantially outweighed by a

---

[7] Even if the Court did not conclude that the subject evidence is inextricably intertwined with the charged conduct, the Court would nevertheless conclude that the evidence is admissible under Rule 404(b).  This evidence would be admissible for a proper purpose under Rule 404(b) to show motive, intent, plan, knowledge or lack of accident.  *See United States v. Esparsen*, 930 F.2d 1461, 1476 n.16 (10th Cir. 1991) (observing that "motive, intent, plan or knowledge essentially involve 'consciousness of guilt'").  For this reason, and due to the temporal proximity between these events and the alleged assault, the evidence is relevant.  And the Court has conducted a Rule 403 analysis below and does not find exclusion necessary.

danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. This rule "creates a 'presumption' of admissibility," and the party opposing admission of the evidence must demonstrate that exclusion is proper. 22A Daniel D. Blinka & Kenneth W. Graham, Jr., *Federal Practice & Procedure (Wright & Miller)* § 5221 (2d ed. Apr. 2025 update); *United States v. Diega Delgado*, No. 05-cr-00920-JB, 2006 WL 1228774, at *3 (D.N.M. Feb. 10, 2006) (citing *United States v. Tse*, 375 F.3d 148, 164 (1st Cir. 2004)).

Defendant argues first that this evidence should be excluded under Rule 403 because the evidence has no probative value. [Doc. 44 at 10–11]. He challenges the reliability of the evidence; specifically, with respect to the softball practice incident, he argues that a witness—Minor #4—originally said that Defendant was spotted at the practice on September 15, 2023, a date he was at home, and that the vehicle at the softball field had a white license plate, while his license plate is black. [*Id.* at 2–4].

The Court respectfully disagrees that this evidence has no probative value. As the Government explains, while Minor #4 originally identified the wrong date, she later recalled the contact as occurring on August 13, and other evidence corroborates this date, too. [Doc. 60 at 2]. Any effect that Minor #4's original misidentification has on the probative value of this evidence is minimal. Moreover, any discrepancy between the color of the license plate on Mr. Miller's car and the car observed at the softball field does not completely eliminate the probative value of this evidence. Certainly, Defendant can highlight this discrepancy through cross-examination and competing evidence to challenge its weight or the credibility of witnesses offered by the Government, but

exclusion is not warranted.  And as explained above, this evidence may bear on Defendant's credibility and/or motive, intent, plan, knowledge, lack of accident, or consciousness of guilt.  Accordingly, the Court concludes that the evidence has a tendency to make a fact of consequence in this action more or less probable and is therefore relevant and probative.

In the alternative, Defendant contends that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, and wasting time.  [Doc. 44 at 11].  He argues that admitting evidence of the July 2023 traffic stop will cause confusion and will require the Parties "to argue a case within a case by presenting facts and evidence regarding why the traffic stop . . . was supported by reasonable suspicion and/or probable cause."  [*Id.* at 11–12].  The Court respectfully disagrees, as the reasonableness of the traffic stop is not at issue in this case.  *See* [Doc. 60 at 6 ("[T]he Government will not argue that the defendant was breaking the law on any of the occasions cited in the Government's Notice.")].  Defendant's argument about the second incident is based on his contention that Minor #4 originally identified the date of the incident as September 15, 2023, when he was at home with his wife; Defendant argues that he will "be placed in a position to waive certain rights, like spousal and martial [sic] privilege, to address the issue."  [Doc. 44 at 12]. This contention is unsupported by any explanation or legal authority, and the Court is not persuaded by it.

Finally, Defendant argues that the allegation that he was at Minor #1's softball practice is "highly prejudicial" because there is "no evidence that the vehicle at the softball game was in fact Mr. Miller's" and there is no eyewitness that places Mr. Miller personally

at the softball field.  [*Id.*].  But "[e]vidence is not unfairly prejudicial simply because it is damaging to [a party's] case."  *United States v. Curtis*, 344 F.3d 1057, 1067 (10th Cir. 2003).  "Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart* from its judgment as to his guilt or innocence of the crime charged."  *United States v. MacKay*, 715 F.3d 807, 840 (10th Cir. 2013) (emphasis added).  In conducting a Rule 403 analysis, the Court must "give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."  *United States v. Cerno*, 529 F.3d 926, 935 (10th Cir. 2008).  And it is "not enough that the risk of unfair prejudice be greater than the probative value of the evidence; the danger of that prejudice must *substantially* outweigh the evidence's probative value."  *Id.*

The probative value of evidence placing Defendant at the softball field may be tempered by the fact that Mr. Miller himself was not observed at the field and given Defendant's contentions about the license plate discrepancy.  Even so, the Court does not find any danger that this evidence will provoke an emotional response in the jury or will cause the jury to rely on an improper basis in rendering its verdict.  Defendant will have the opportunity to cross-examine witnesses and offer competing evidence to support his position that it was not his car at the softball field.  Because the probative value of this evidence is not outweighed by any of the Rule 403 considerations, the Court will not exclude this evidence.  The Government's Rule 404(b) Motion is **GRANTED**.

### III.    Motion to Suppress Marital Communications

Defendant was detained at the Larimer County jail from approximately March 22, 2024 to April 2, 2024.  [Doc. 4; Doc. 15; Doc. 34 at ¶ 6; Doc. 39 at 3].  Invoking the marital

communications privilege, Mr. Miller now moves to suppress evidence of telephone conversations with his wife that took place while Mr. Miller was in custody.  *See* [Doc. 34 at 3–4, 9].[8]

### A.    Legal Standard

Under federal common law, there are two aspects of marital privilege.  "[T]he testimonial privilege . . . permits one spouse to decline to testify against the other during the marriage," while "the marital communications privilege" permits "either spouse . . . to prevent the other from testifying to confidential communications made during the marriage."  *United States v. Montague*, 421 F.3d 1099, 1103 (10th Cir. 2005) (quotation omitted).  Defendant's Motion concerns only the latter.  *See* [Doc. 34 at 6].

"The marital communications privilege covers all confidential communications made during a valid marriage with a few exceptions, including communications not made in absolute confidence."  *United States v. Candelaria*, No. 22-cr-00767-KWR-1, 2023 WL 8477960, at *1 (D.N.M. Dec. 7, 2023) (quotation omitted).  Indeed, the privilege does not apply "if a communication due to the circumstances or its nature was not intended to be confidential, *e.g.*, made in the presence of a third party."  *Id.*  Like all privileges, the marital communications privilege is construed narrowly.  *United States v. Neal*, 743 F.2d 1441, 1447 (10th Cir. 1984).  "The party seeking to assert an evidentiary privilege has the

---

[8] The bulk of Defendant's Motion seeks suppression of communications between Mr. Miller and his wife that were extracted from his personal cellphone.  [Doc. 34 at 4–5, 9]. In its Response, the Government represents that it will not seek to admit any communications between Defendant and his wife that were obtained from Defendant's personal cellphone.  [Doc. 39 at 4].  Accordingly, the Court concludes that this request is moot and does not address it further.  *See United States v. Mikolon*, 719 F.3d 1184, 1189 (10th Cir. 2013) (stating that the district court "could have ignored" suppression issue after the government stated it would not seek to admit the challenged statements, thus "[taking] the[] statements 'off the table'").

burden of establishing its applicability." *United States v. Knox*, 124 F.3d 1360, 1365 (10th Cir. 1997).

**B.      Analysis**

Defendant argues that evidence of any jail calls between him and his wife should be suppressed under the marital communications privilege. [Doc. 34 at 9]. He argues that these calls "fall under the auspice of the privilege" because Mr. Miller, as a detainee, had no other way to communicate with his wife and no one in his position "could have or would have the ability to knowingly, voluntarily, or intelligently waive such an important privilege." [*Id*.]. The Government responds that the marital communications privilege does not apply to the jail calls because Defendant and his wife were each informed via automated recording that their calls were being monitored and recorded. [Doc. 39 at 4–5]. It contends that "there is no question" that Defendant and his wife knew that their calls "were not private." [*Id*. at 5–6].[9] In his Reply, Defendant asserts that any standard message informing Defendant and his wife that the calls were recorded "does not change the analysis" because the Government "has no idea what Mr. Miller or Mrs. Miller's understandings of such a stock recorded message was." [Doc. 64 at 3]. He also represents that the recorded messages "do not warn an inmate that the call *will* be monitored," but instead "state that a call may be subject to monitoring at some unknown and undisclosed time in the future." [*Id*.].[10]

---

[9] The Government also argues that marital communications are not subject to suppression and Defendant's request should have been raised in a motion in limine instead. [Doc. 39 at 6–9]. In the Reply, Mr. Miller seems to concede such point. [Doc. 64 at 6]. The Court finds it most efficient to rule on the applicability of the marital privilege to the jail calls between Mr. and Ms. Miller now, given that the issue has been fully briefed.

[10] The Parties have not provided the Court with a copy of the recorded message, but the Government represents that "a recorded message states, '[t]his call is from a corrections

The Tenth Circuit has not expressly ruled whether jail calls between an inmate and the inmate's spouse are protected by the marital communications privilege. It has, in the context of a Fourth Amendment challenge, stated that "no prisoner should reasonably expect privacy in his outbound telephone calls." *United States v. Gangi*, 57 F. App'x 809, 815 (10th Cir. 2003) (quoting *United States v. Van Poyck*, 77 F.3d 285, 291 (9th Cir. 1996)). Despite the different legal context, the Court finds this principle relevant here. And other courts that *have* addressed this precise issue appear to uniformly hold that detainees or inmates who are warned that their calls may be monitored or recorded have no reasonable expectation that conversations using jail telephones will be confidential, private, or protected by the marital privilege. *See, e.g.*, *United States v. Mojocoa*, No. 23-12132, 2024 WL 3098266, at *7 (11th Cir. June 24, 2024); *United States v. Tartaglione*, 228 F. Supp. 3d 402, 407–08 (E.D. Pa. 2017) (collecting cases and explaining that "[t]he presence of a device monitoring and recording all phone calls made in prison is the functional equivalent of a third party listening to the conversations"); *United States v. Lott*, No. 21-cr-00275-RAH-SRW, 2021 WL 8443791, at *10 (M.D. Ala. Dec. 8, 2021), *report and recommendation adopted*, 2022 WL 1125794 (M.D. Ala. Apr. 15, 2022); *United States v. Sutton*, No. 6:17-cr-00032-GFVT-HAI, 2018 WL 542968, at *4 (E.D. Ky. Jan. 24, 2018), *aff'd*, 769 F. App'x 289 (6th Cir. 2019).[11] Indeed, Defendant's arguments are not

---

facility and is subject to monitoring and recording.'" [Doc. 39 at 3]. Mr. Miller does not contest that this is an accurate quotation of the warning. *See* [Doc. 64].

[11] The fact that the recording apparently said that the calls *may* be subject to monitoring does not change this analysis. *See United States v. DeLeon*, No. 15-cr-04268-JB, 2018 WL 2093195, at *2 n.2 (D.N.M. May 3, 2018) (recording informing inmates that calls "may be monitored" were not private); *United States v. Chaiban*, No. 2:06-cr-00091-RLH-PAL, 2007 WL 437704, at *8, *21 (D. Nev. Feb. 2, 2007) ("notice [that] conversations may be monitored or recorded destroys any expectation of privilege"), *report and recommendation adopted*, 2007 WL 923585 (D. Nev. Mar. 23, 2007).

supported with specific legal authority, but rather rely on general legal principles. Strikingly, Defendant identifies no case in which a court has applied the marital communications privilege to protect jail communications between spouses when those individuals are on notice that their calls are being monitored, and he cites no authority to support the proposition that "[n]o one in Mr. Miller's position, as a jail inmate with no other way to communicate with a spouse, could have or would have the ability to knowingly, voluntarily or intelligently waive such an important privilege." [Doc. 34 at 9].

Because Defendant's argument in support of suppression of the jail calls is unsupported by legal authority, the Court cannot conclude that he has met his burden to demonstrate that suppression of the jail calls is warranted. Moreover, given the significant weight of authority holding that jail calls between spouses are not privileged, coupled with the Tenth Circuit's statement in *Gangi*, the Court respectfully predicts that the Tenth Circuit would hold that jail calls between spouses, if the participants have been warned that their conversation may be subject to monitoring and/or recording, are not private or confidential and are not protected by the marital communications privilege. Accordingly, the Motion to Suppress Marital Communications is respectfully **DENIED**. As contemplated by the Parties, the Court may address any other admissibility challenges at the time that specific evidence is at issue.

## IV.    Motion to Suppress Under the Fifth Amendment

Next, Mr. Miller contends that the Court "should suppress all statements obtained" during the LCSO interview on the basis that the interview "was a custodial interrogation that should have started with *Miranda* and *Garrity* warnings." [Doc. 35 at 2]. He also

argues that notwithstanding any *Miranda* issue, the statements he made during the interview were not made voluntarily and should be suppressed.  [*Id.* at 10].

### A.   *Miranda*

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  "[A]n individual's Fifth Amendment privilege against self-incrimination is 'jeopardized' when they are in custody and subjected to questioning."  *United States v. Martinez*, 122 F.4th 389, 405 (10th Cir. 2024) (quoting *Miranda v. Arizona*, 384 U.S. 436, 478 (1966)).  Under *Miranda*, a suspect in custody must be warned that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  384 U.S. at 479.  "Without these warnings, custodial confessions are presumed to be the product of coercion and are generally inadmissible for purposes of the prosecution's case in chief."  *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021) (citation omitted).

A *Miranda* warning is only required, however, if the suspect is subject to "custodial interrogation."  *Martinez*, 122 F.4th at 405.  A person is in "custody" if a reasonable person in the same position "would have understood the situation to constitute a 'restraint on freedom of movement of the degree associated with a formal arrest.'"  *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  "The defendant bears the initial burden of establishing they were subject to custodial interrogation."  *Id.* (collecting cases).  If the defendant makes this showing, then "the burden shifts to the Government to

establish by a preponderance of the evidence that any waiver of the defendant's Fifth Amendment privilege comported with the requirements of *Miranda* and its progeny."  *Id.*

Factors relevant to the Court's determination of custody include "(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [the subject] aware that []he was free to refrain from answering questions, or to otherwise end the interview."  *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007).  The Court addresses each below.

***Police-Dominated Atmosphere.***    Mr. Miller argues that the interview was conducted in a police-dominated atmosphere because he was "escorted by two LCSO officers in a vehicle to a different police station specifically for purposes of interrogation" and was "kept in an interrogation room at the substation with the door closed and interrogated in the presence of two officers who were attempting to elicit a confession." [Doc. 35 at 7–8].  The Government responds that the location of the interview is not dispositive in determining whether the interview was police-dominated, and it notes that Mr. Miller voluntarily agreed to go to the substation, was not handcuffed, and sat in the front seat of the police vehicle on the drive to the substation.  [Doc. 46 at 5].

To determine whether an environment was "police-dominated," courts consider factors such as:

> Separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) (brackets omitted). "This is a fact-intensive inquiry focusing on the totality of the circumstances." *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008). Here, the Court considers both the testimony provided during the evidentiary hearing as well as the actual interview recorded by Sergeant Servin's body-worn camera.

Mr. Miller was interviewed by Sergeant Servin in a closed-door room at the LCSO substation. [Hearing Tr. at 113:25–114:13; Doc. 35-1 at 08:12:03]. However, "[a]lthough interviews taking place at the police department are more likely to be 'police-dominated,' . . . the mere fact that [the defendant] was questioned by himself in a nonpublic office at the police department . . . does not transform this interview into a custodial interrogation." *Chee*, 514 F.3d at 1114; *see also United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008) ("[L]ocation alone does not compel the conclusion that a defendant is in custody, so long as his freedom was not curtailed to a degree similar to arrest."); *Beheler*, 463 U.S. at 1125 ("*Miranda* warnings are not required simply because the questioning takes place in the station house."). Here, Mr. Miller was a law enforcement officer who was first placed on administrative leave at his place of employment—a police station—and moved to a different location due to the "sensitive" nature of the interview and to "have . . . separation" between the LPD and LCSO. [Hearing Tr. at 114:8–13]. And while Sergeant Servin closed the interview room's door, she informed Mr. Miller that she did so "for privacy only," told Mr. Miller that the door was not locked and that he could leave or end the interview, and had previously told him that he was not under arrest. [Doc. 35-1 at 08:01:18–24, 08:12:03–19]; *see also United States v. Krehbiel*, 378 F. App'x 832, 835 (10th Cir. 2010) (defendant was not in custody where officers blocked his exit because this "was simply

the result of the size and layout of the room rather than any show of authority or action on the part of the officers themselves").

Nor do other aspects of the interview suggest police domination.  Sergeant Servin and Sergeant Maul both wore plain clothes, [Hearing Tr. at 114:21–115:1], and Mr. Miller was never handcuffed, [Doc. 35-1 at 08:11:29–44]; *see also United States v. Tom*, No. 02-cr-02277-MV, 2004 WL 7337487, at *8 (D.N.M. Dec. 29, 2004) (considering officers' plain clothes in finding that interviews were not police-dominated); *Lamy*, 521 F.3d at 1264 (considering that the defendant was not handcuffed in ultimately holding that there was no custodial interrogation); *Guillen*, 995 F.3d at 1110 (same).  At no time did Mr. Miller express to Sergeant Servin that he felt pressure; to the contrary, he said he appreciated Sergeant Servin being "very cool" with him.  [Doc. 35-1 at 08:56:54]. Considering all of the relevant factors, the Court concludes that the atmosphere was not "police-dominated" for purposes of *Miranda*.

***The Nature and Length of Questioning.***  Defendant argues that this factor "weighs in favor of custodial interrogation" because Sergeant Servin "ignored Mr. Miller's invocation of his right to counsel more than once," "progressively confronted Mr. Miller with more information related to the allegations but omitted other material information," "revealed facts in order to create shock value," "tried to pressure Mr. Miller into doing a polygraph" test, and, "as a technique to obtain incriminating information," she "initially acted like she understood why Mr. Miller was freaked out, under pressure and stressed out."  [Doc. 35 at 8].  This argument is unsupported by any citations to legal authority. *See* [*id.*].  The Government, meanwhile, contends that the questioning was neither

accusatory nor coercive because it lasted just over an hour and Sergeant Servin never threatened Mr. Miller, raised her voice, or drew a weapon. [Doc. 46 at 5–6].

Though the Defendant does not address the length of the interview in his argument, *see* [Doc. 35 at 8], the Court finds it highly relevant to its analysis. The entire encounter—from when Defendant first met Sergeant Servin and Sergeant Maul at the LPD station to the conclusion of Sergeant Servin's interview—lasted just over an hour, [Doc. 35-1 at 07:57:36–09:01:58], and Sergeant Servin questioned Mr. Miller for about 50 minutes in total, [*id.* at 08:11:32–09:00:05]. The length of the interview does not suggest custody. *See Lamy*, 521 F.3d at 1263 (interview that lasted "about an hour," with nothing "unusually confrontational," would not have led reasonable person to "[feel] the requisite level of constraint"); *Garcia v. Figueroa*, 401 F. App'x 369, 371 (10th Cir. 2010) (observing that length of interview lasting approximately two hours supported conclusion that suspect was not in custody).

Nor was the substance of the interview coercive. Sergeant Servin's questions were not accusatory; in fact, Sergeant Servin tried on many occasions to appear sympathetic to Defendant or skeptical of Minor #1's report. *See, e.g.*, [Doc. 35-1 at 08:37:57 ("I'm trying to just answer some questions. . . . Like, is this female exaggerating the contact? Did you give her a hug, as in, I'm supporting you, because she was going through some rough times? I'm supporting you and, you know, is she exaggerating that contact with, with you?"); *id.* at 08:39:35 ("I'm just trying to figure out, is this an exaggeration on her part, or did something really happen at the park."); *id.* at 08:42:07 ("We can just about explain just about anything, as long as we, you know, work together to get to that explanation.")]. While Defendant seems to suggest that the at-times

personable nature of the interview demonstrates that the interview was coercive, *see* [Doc. 35 at 8], this argument is unsupported by legal authority and is respectfully unpersuasive in light of the video record before the Court.  Sergeant Servin's manner of questioning weighs *against* a finding of custody.  *See United States v. Begay*, 310 F. Supp. 3d 1318, 1358 (D.N.M. 2018) ("The Court concludes that [the officers] did not engage in prolonged accusatory questioning, but, rather, tried to minimize the gravity of a confession and to sympathize with [the defendant] in an attempt to get him to admit that he engaged in sexual acts with [the victim].").  The nature and length of the questioning weigh in favor of finding that Defendant was not in custody.

**Whether Defendant Was Free to End the Interview.**  Defendant contends that he was not free to end the interview because "when Mr. Miller stated he wanted legal counsel, [Sergeant Servin] kept questioning him."  [Doc. 35 at 8].  He also argues that a reasonable person in his position, having just been placed on administrative leave, would not believe that they were free to leave or could end the questioning.  [*Id.* at 8–9].  He also notes that he did not have a car and did not have a phone during the interview.  [*Id.* at 9].

As to Defendant's first argument, whether a suspect has invoked the right to counsel is question of law.  *United States v. Brown*, 287 F.3d 965, 971 (10th Cir. 2002).  To invoke the right to counsel, a suspect "must unambiguously request counsel" and "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  *Davis v. United States*, 512 U.S. 452, 459 (1994).  Defendant does not engage with this analysis or make any argument about whether his statements unambiguously

invoked his right to have counsel present for any additional questioning. *See generally* [Doc. 35]. From the Court's review of the video footage, Mr. Miller's initial statements mentioning counsel could reasonably be construed as *declining to take a polygraph test* without counsel, as opposed to refusing to answer additional questions without counsel. *See* [Doc. 35-1 at 08:52:34 (when asked to take a polygraph test, stating, "I want to provide as much that helps clear things up but I don't, for my own sake, I don't want to like, delve into this a lot without some legal counsel, just because, I don't know, I took the polygraph for Loveland and I twitched my toe and we had to start over. . . . I know you're not forcing me into it, I would just rather have some legal counsel before anything just because this is a lot[.]")]. Later in the interview, Mr. Miller makes a much clearer statement: "I want to refer to some legal counsel *before I do anything else*." [*Id.* at 08:57:13]; *see also* [*id.* at 08:57:50 ("I think I would just like to pump the breaks right now.")]. Sergeant Servin then stopped substantively questioning Mr. Miller. [*Id.* at 08:57:50–09:01:44]. Defendant's conclusory argument is insufficient to convince the Court that Sergeant Servin ignored a clear invocation of counsel.

Nor is the Court persuaded that Defendant's lack of immediate access to his phone or car would make a reasonable person feel that they could not end the interview, as Defendant was immediately informed by Sergeant Servin that if he joined them at the LCSO substation, he would be brought back to the LPD station at the conclusion of the interview. [Doc. 35-1 at 07:59:33 ("We're going to bring you back as soon as it's, as soon as our interview is done."); *id.* at 08:00:03 ("What I'm telling you is today, we're coming back here. You're coming back here, nothing is happening today other than us talking to you about this allegation.")].

This conclusion is bolstered by the numerous advisements given to Defendant that he was free to leave and could stop the interview at any time. *See* [*id.* at 08:00:51 ("This is a totally voluntary interview"); *id.* at 08:01:33 ("Again, voluntary interview, you run it, you know how this goes, and anytime you can tell me that we're done"); *id.* at 08:11:43 ("You're not in custody, and this is a voluntary interview. . . . At any time you can tell me we're done and you can leave"); *id.* at 08:12:14 ("You have the right to tell me we're done. Do you understand that?")]. "That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview." *Jones*, 523 F.3d at 1240; *see also Chee*, 514 F.3d at 1114. In fact, Mr. Miller did end the interview, and Sergeant Servin ceased asking him any substantive questions. [Doc. 35-1 at 08:57:16].

Considering the totality of the circumstances, the Court concludes that Defendant has not met his burden to demonstrate that a reasonable person in his position "would have understood the situation to constitute a restraint on freedom of movement of the degree associated with a formal arrest." *Martinez*, 122 F.4th at 405 (quotation omitted). He was thus not in custody, and no *Miranda* advisement was required.

## B.    *Garrity*

"[W]hen a public employer conducts an internal investigation," it may not "use any incriminating statements against the employee in a criminal prosecution regarding the matter under investigation." *McKinley v. City of Mansfield*, 404 F.3d 418, 423 (6th Cir. 2005) (citing *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967)). The rationale behind this rule is that "the threat of losing their jobs to induce [government employees] to give up their privilege against self-incrimination ma[kes] the [employees]' statements involuntary

and therefore inadmissable in the criminal proceedings." *United States v. Hollis*, 971 F.2d 1441, 1458 (10th Cir. 1992). "A *Garrity* . . . 'warning' to an employee informs the employee that he must make a statement or face termination but that any statement so made cannot be used in a subsequent criminal prosecution." *United States v. Huang*, No. 12-cr-01246-WJ, 2014 WL 12789662, at *1 (D.N.M. July 9, 2014).

Mr. Miller argues, in passing, that the interview "was a custodial interrogation that should have started with . . . [a] *Garrity* warning[]." [Doc. 35 at 2]. He does not develop this argument; indeed, the substance of his Motion focuses exclusively on the lack of *Miranda* warnings. *See* [*id.* at 6 ("This Court Should Suppress All Statements That Were Obtained During The Custodial Interrogation In Violation Of *Miranda* And The Fifth Amendment"); *id.* at 6–10 (discussing the requirements of *Miranda* and analyzing the LCSO interview under *Miranda*)]. He mentions *Garrity* only to assert that, for purposes of *Miranda*, "the lack of *Garrity* warnings . . . establishes that [the interview was taken in] a custodial setting involving a criminal investigation because otherwise, *Garrity* warnings would have been provided as they are supposed to be during internal investigations and other types of interviews where statements can be compelled in a non-criminal, employment situation." [*Id.* at 9].

Mr. Miller does not expressly argue that his rights were violated under *Garrity*, does not set forth the applicable standard under *Garrity*, and engages in no substantive *Garrity* analysis. *See* [Doc. 35]. He has thus not done enough to put the issue before this Court. *See United States v. Marquez*, 898 F.3d 1036, 1052 (10th Cir. 2018) (declining to consider inadequately briefed argument); *Butler v. Daimler Trucks N. Am.*, 74 F.4th 1131,

1142–43 (10th Cir. 2023) (a legal theory must be "actually articulated," rather than "merely insinuated" (quotation omitted)).

Even so, his argument is unconvincing.  He appears to assert that the interview must have been either a custodial interview in furtherance of a criminal investigation or a noncustodial, administratively focused interview.  *See* [Doc. 35 at 9 (arguing that if the interview was noncustodial, "*Garrity* warnings would have been provided"); Doc. 65 at 6 (arguing that "the government cannot claim this was an interview focused on criminal offenses that was not pursuant to a custodial interrogation, and on the other hand, state that the interrogation had no significance in an employment context")].  There is no support for such a position, and Assistant Chief Trombley and Sergeant Servin each testified that the LCSO interview was part of a criminal investigation that was separate from any internal affairs investigation.  *See* [Hearing Tr. at 36:14–21, 47:13–48:16, 97:10–23, 100:2–14].  Moreover, "[t]o make out a *Garrity* claim, the officer must demonstrate that he had been put 'between the rock and the whirlpool,' by having to choose whether to incriminate himself or to lose his job."  *United States v. Cook*, 526 F. Supp. 2d 1, 6–7 (D.D.C. 2007) (quoting *Garrity*, 385 U.S. at 498), *aff'd*, 330 F. App'x 1 (D.C. Cir. 2009); *see also United States v. Ortino*, No. 19-cr-00142-WHO-1, 2019 WL 6493985, at *6 (N.D. Cal. Dec. 3, 2019) ("For the *Garrity* rule to apply, the government must have created a penalty situation—it must have made some sort of threat." (citing *Minnesota v. Murphy*, 465 U.S. 420, 435 (1984)), *aff'd*, No. 22-10218, 2023 WL 8712062 (9th Cir. Dec. 18, 2023).  Mr. Miller makes no such argument here, and provides no basis for suppression of his statements under *Garrity*.

C.    Voluntariness

Finally, Defendant argues that even if *Miranda* warnings were not required, the statements he made during the LCSO interview were nevertheless involuntary and must be suppressed on this basis.  [Doc. 35 at 10].

"[E]ven when a confession is not obtained in violation of *Miranda*, it must nonetheless be voluntary to be admissible."  *United States v. Cash*, 733 F.3d 1264, 1280 n.12 (10th Cir. 2013).  A statement is voluntary if it was "the product of an essentially free and unconstrained choice by its maker."  *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (quotation omitted).  On the other hand, a statement is involuntary—and cannot be used against the defendant—if "law enforcement overbore the defendant's free will and critically impaired the defendant's capacity for self-determination."  *United States v. Pena*, 115 F.4th 1254, 1261 (10th Cir. 2024) (quotation omitted).

"Voluntariness is determined under the totality of the circumstances, and no single factor is determinative."  *United States v. Young*, 964 F.3d 938, 942 (10th Cir. 2020).  Relevant factors include "the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect."  *United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010).  The Court also considers the conduct of the officer(s) conducting the interview.  *United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993).  The Government bears the burden of demonstrating by a preponderance of the evidence that a statement was voluntarily made.  *Lopez*, 437 F.3d at 1063.

Mr. Miller contends that all of the statements he made during the interview were involuntary because (1) he was not provided *Miranda* or *Garrity* warnings; (2) he was driven to the LCSO substation and had no way of leaving and had no access to his phone; (3) he was interviewed in a closed room;[12] (4) he subjectively felt "like he was under arrest"; (5) his "mental state was compromised" and he was stressed and worried during the interview; and (6) he was a police officer, which he asserts "weighs in favor of how his will was overborne" because Sergeant Servin "used the nice, collegial approach with him at first" and "manipulated [his] status as a police officer to gain his trust so that [she could] lure him into an interview." [Doc. 35 at 11–12].

For its part, the Government argues that Mr. Miller's statements were voluntary. It notes that Defendant is a trained police officer and "was therefore familiar with the distinction between a voluntary interview and an interview in which he would not be free to leave." [Doc. 46 at 8–9]. Moreover, the Government observes that the entire encounter lasted a bit over an hour, the nature of the questioning was not coercive, and Defendant was informed of the voluntary nature of the interview on multiple occasions. [*Id.* at 9–10].

The Court finds that the Government has demonstrated, by a preponderance of the evidence, that Mr. Miller's statements were voluntary. The entire encounter with Sergeant Servin lasted approximately one hour, with 50 of those minutes dedicated to

---

[12] Mr. Miller also states that he "was told to remain [in the interview room] when the interview concluded because his bosses wanted to speak with him" and suggests that this weighs in favor of finding his interview statements involuntary. [Doc. 35 at 11]. It is unclear to the Court how Sergeant Maul's statement—at the conclusion of the interview— informing Mr. Miller that he "just got off the phone with some of [Defendant's] bosses so if [he'll] just hang here for a bit, it sounds like they want to come over and chat with [Defendant] here in a few minutes," followed by a statement that Defendant was "free to walk around," [Doc. 35-1 at 09:00:08–26], could render Mr. Miller's prior statements involuntary.

questioning; this length was not long enough to be coercive. *See United States v. Woody*, No. 1:18-cr-03902-JB, 2020 WL 3513486, at *26 (D.N.M. June 29, 2020) (interrogation lasting for an hour and 15 minutes was not long enough to be coercive), *aff'd*, 45 F.4th 1166 (10th Cir. 2022); *United States v. Martinez*, No. 1:02-cr-01055-JB, 2006 WL 4079686, at *14 (D.N.M. Nov. 21, 2006) (two-hour interrogation did not render statements involuntary). As discussed in detail above, the nature and circumstances of the interview all suggest a non-coercive environment: Sergeant Servin told Mr. Miller that he could end the interview at any time; the relocation and Sergeant Servin's decision to shut the interview room door were clearly explained to Mr. Miller; Mr. Miller was informed that he would be brought back to the LPD station after the interview; and Sergeant Servin's questions were non-accusatory and non-threatening. *See Lamy*, 521 F.3d at 1262 ("The short length of . . . questioning, nonthreatening nature of questioning, and lack of any physical punishment all indicate that [the suspect's] statements were not coerced.").

Moreover, contrary to Defendant's argument, his employment as a police officer weighs in favor of finding his statements were voluntary: a police officer is certainly less likely to be intimidated by, or coerced by, another law enforcement officer. *Cf. United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002) (noting that the defendant "had previous experience with the criminal justice system" in finding that there was no evidence that the defendant was unusually susceptible to coercion). Finally, while Defendant may have been upset or stressed during the interview, the Court cannot conclude that this rendered his statements involuntary. Most individuals subject to a criminal investigation would experience some level of stress, and there is no indication that Sergeant Servin exploited Mr. Miller's distress; in fact, she acknowledged his feelings on multiple

occasions. *See, e.g.*, [Doc. 35-1 at 08:00:38 ("Believe me, bud, I totally get it. If I was standing in your shoes, I'd be freaking out also."); *id.* at 08:40:55 ("I get that you're coming from a very stressful place and you've been in a very stressful place for the last ten months.")]. Despite his heightened emotional state, Defendant was able to understand Sergeant Servin's questions, provide clear answers, and even ask follow-up questions. *Cf. United States v. Bunce*, No. 00-cr-40024-SAC, 2001 WL 1159768, at *10 (D. Kan. Aug. 6, 2001) (finding *Miranda* waiver voluntary despite the defendant's "agitated state" because the agents "patiently talk[ed] with" the defendant and engaged her in conversation where she "demonstrated her capacity for thinking intelligently").

Considering all of the relevant factors, the Government has demonstrated that Mr. Miller's statements were voluntarily made, and those statements will not be suppressed. The Motion to Suppress Under the Fifth Amendment is respectfully **DENIED**.

## V. Motion to Suppress Under the Fourth Amendment

The Fourth Amendment to the United States Constitution "protects the people from unreasonable searches and seizures of 'their persons, houses, papers, and effects.'" *Soldal v. Cook Cnty.*, 506 U.S. 56, 62 (1992) (quoting U.S. Const. amend. IV). "For a search . . . to be reasonable, it must ordinarily be supported by a warrant based on probable cause." *United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021).

Defendant moves to suppress a wide range of evidence under the Fourth Amendment. First, he argues that the warrantless seizure of his personal cellphone and work cellphone[13] was neither supported by probable cause nor justified by exigent

---

[13] In his Motion, Defendant requests that the Court "declare that the warrantless seizure of [his] <u>personal cell phone</u> was unsupported by probable cause and/or exigent circumstances" and "suppress all evidence from Mr. Miller's <u>personal cell phone</u>." [Doc. 36 at 10 (emphasis added)]; *see also* [*id.* at 2 ("The Warrantless Seizure Of Mr. Miller's

circumstances. [Doc. 36 at 2–4]. Then, he raises a few arguments challenging the various search warrants issued during the investigation of this case. He argues (1) the warrants were insufficiently particular, [*id.* at 4–5]; and (2) the warrants were too broad, [*id.* at 6–8]. Elsewhere—in a "chart [attached to the Motion] which sets forth the warrants and stated objections thereto, *see* [*id.* at 6]—he argues that many of the warrants were not supported by probable cause, *see* [Doc. 36-1].[14] Then, he contends that even if the warrants themselves complied with the Fourth Amendment, the search of "the phone" exceeded the scope of "the warrant," without clearly articulating to which warrant or which phone he refers. [Doc. 36 at 8–9].

## A.    Expectation of Privacy

To challenge the warrantless seizure or search of his phones, Mr. Miller must have a reasonable expectation of privacy in those items. *United States v. Gordon*, 168 F.3d 1222, 1228 (10th Cir. 1999). The defendant bears the burden of showing that he had a subjective expectation of privacy and that this expectation of privacy is one that society is prepared to recognize as reasonable. *United States v. Maestas*, 639 F.3d 1032, 1035 (10th Cir. 2011).

---

Personal Cell Phone Was Unreasonable, Unsupported By Probable Cause, Unsupported By Exigent Circumstances And All Information Obtained From That Device And All Fruits Should Be Suppressed." (emphasis changed)]. At the evidentiary hearing, however, Defendant raised a number of arguments about his expectation of privacy in his work phone. When questioned by the Court, defense counsel stated that while the Motion to Suppress "wasn't artfully worded," Defendant was requesting suppression of evidence from his work phone. [Hearing Tr. at 150:18–151:15]. However, the Motion's presentation goes beyond unclear or unartful wording—Defendant expressly limits the requested relief to his personal phone. Nevertheless, because the Government addresses the work phone in its response, *see* [Doc. 40], and due to counsel's clarification at the hearing, the Court will address the argument.

[14] The Court addresses the insufficiency of Defendant's presentation of this argument in more detail below.

The Government argues that Mr. Miller had no reasonable expectation of privacy in his work phone.  [Doc. 40 at 4–5].[15]  Relevant to the Parties' arguments on this point, LPD Policy Number 5.06, which "establish[es] guidelines for conducting regular periodic inspections of personnel, equipment and operations," states:

> **No Expectation of Privacy**
> <u>Any equipment used for department business</u> is subject to unannounced seizure, inspection, recording and review, <u>including phones</u>, emails, and text messages.  <u>Professional staff have no expectation of privacy when accessing or utilizing any department resource</u> unless specifically stated otherwise in the policies.

[Doc. 40-2 at 1, 3 (underlining added)].  In addition, LPD Policy Number 6.01, which "establish[es] a practice of effectively utilizing mobile technology for all law enforcement functions," states that LPD staff members "are permitted to utilize Department issued cellular phones for reasonable periods of personal, non-commercial use, consistent with the City's [Administrative Regulation] regarding Cellular Phone Issuance, Usage, and Retirement."  [*Id.* at 5].[16]  Mr. Miller completed an electronic acknowledgment of these LPD policies.  [Hearing Ex. 3; Hearing Ex. 5; Hearing Tr. at 68:1–10, 70:15–71:2].

The Government argues that Mr. Miller had no reasonable expectation of privacy in his work phone because LPD policies make clear that employees have no expectation of privacy in their work devices.  [Doc. 40 at 4–5].  Defendant disagrees, arguing that Policy Number 5.06 "warns there is no expectation of privacy for 'any equipment used *for department business*,'" but "is silent as to the employee's expectation of privacy when the use is personal."  [Doc. 62 at 4 (emphasis in original)].  Mr. Miller insists that because

---

[15] The Government does not dispute that Mr. Miller had an expectation of privacy in his personal phone.  *See generally* [Doc. 40].

[16] The City of Loveland has promulgated an Administrative Regulation concerning "Cellular Phone Issuance, Usage and Retirement."  *See* [Doc. 40-2 at 8–10].

other policies allow for some incidental use of the work phone for personal matters, he maintains some expectation of privacy over the device as a whole.  [*Id.* at 4–5].

As a preliminary matter, Defendant misreads the policy language.  Policy Number 5.06 broadly, and clearly, states that *any device* used for department business is subject to unannounced inspection or seizure, and that staff members have no expectation of privacy when accessing or using *any* department resource.  It does not, as Defendant suggests, eliminate an employee's expectation of privacy in those devices only insofar as the employee uses the device for LPD business, nor does it suggest that different levels of privacy are applied depending upon the device's use.

Courts review employees' expectation of privacy in the workplace "on a case-by-case basis."  *United States v. Angevine*, 281 F.3d 1130, 1134 (10th Cir. 2002).  "Public employees' expectations of privacy . . . may be reduced by virtue of actual office practices and procedures, or by legitimate regulation."  *O'Connor v. Ortega*, 480 U.S. 709, 717 (1987).  To determine whether an employee has standing to challenge the seizure of an item from the workplace, courts "consider all of the relevant circumstances," including (1) the employee's relationship to the item seized; (2) whether the item was in the immediate control of the employee when it was seized; and (3) whether the employee took actions to maintain his privacy in the item.  *United States v. Anderson*, 154 F.3d 1225, 1232 (10th Cir. 1998).

The first factor—Mr. Miller's relationship to the item seized—weighs against a finding that he had an objectively reasonable expectation of privacy in the device.  Mr. Miller's work phone was the property of the City of Loveland.  [Hearing Tr. at 18:5–9]. Although Mr. Miller's lack of ownership over the device "is not determinative, it is an

important consideration in determining the existence and extent of a defendant's Fourth Amendment interests." *Angevine*, 281 F.3d at 1134 (quotation omitted). Because the City of Loveland owned the phone, Mr. Miller's relationship to it was incidental to, and contingent on, his employment with LPD. Moreover, LPD Policy 5.06 specifically informs employees that their work phones are "subject to unannounced seizure, inspection, recording, and review" and that employees have no expectation of privacy in those devices. [Doc. 40-2 at 3]. "Reasonable people in [Mr. Miller's] employment context would expect [LPD] policies to constrain their expectations of privacy in the use of" City-owned devices. *Angevine*, 281 F.3d at 1135 (finding that professor had no expectation of privacy in his university-issued computer).[17]

Moreover, *when the device was seized*, it was not within Mr. Miller's immediate control. In the course of placing Mr. Miller on administrative leave, Lieutenant Pyle took Mr. Miller's work phone and placed it in Assistant Chief Trombley's secure office. [Hearing Tr. at 17:15–18:4]; *see also* [*id.* at 61:19–25 (Assistant Chief Trombley discussing "securing Officer Miller's equipment")]. Defendant does not argue that this administrative step constituted a Fourth Amendment seizure; in fact, he argues that "it is <u>uncontested</u>

---

[17] Defendant argues that this factor weighs in his favor because LPD policies permitted employees to use their work phones for limited personal use, "which personal use Mr. Miller was financially responsible for." [Doc. 62 at 5]. Defendant's argument is based on the fact that a City of Loveland Administrative Regulation—adopted on September 9, 2003—states that, with respect to personal calls on work phones, "[p]lans that are based on minute-to-minute calling . . . will be allowed 30 minutes of incoming or outgoing personal calls per month" and "[a]ll personal calls in excess of the 30 minutes will be reimbursed to the City." [Doc. 40-2 at 8]. Defendant has provided no evidence, however, that his work phone operated under a minute-to-minute plan or that he was actually financially responsible for any personal use of his work device, and has not cited any binding authority to support the conclusion that *de minimis* personal use could somehow cloak an undisputed work phone with an expectation of privacy.

that LCSO Rita Severin [sic] seized Mr. Miller's work phone . . . without a warrant on October 17, 2023, <u>after the custodial interview</u>."    [Doc. 36 at 3 (emphasis added)]. Because the work phone was not in Defendant's immediate control at the time of seizure, this weighs against a finding that he had an expectation of privacy.  *Angevine*, 281 F.3d at 1135.

Regarding whether Defendant took steps to maintain privacy in his work phone, Defendant notes in his reply brief that LPD policy requires staff members to "generate a lock code to enhance the security of all Department issued cellular phones."  *See* [Doc. 40-2 at 5]; *see also* [Doc. 62 at 5].  He argues that he had an expectation of privacy in the phone because LPD "could not open [his] cellphone without the use of his private code." [Doc. 62 at 5].  However, the Court is not convinced that the use of a passcode on the work-issued device creates a robust expectation of privacy in that device, particularly because LPD policy states that "[d]uring any maintenance of a Department issued cellular phone, staff members shall share [the] lock code with the Department's [IT staff] in an effort to provide effective service," [Doc. 40-2 at 5], and the phones remain subject to unannounced inspection, [*id.* at 3].  In other words, there is always a chance that LPD employees will be required to share their passcodes with LPD personnel, and Defendant's use of a passcode that he could be required to share does not defeat the other factors weighing against a reasonable expectation of privacy.

Considering all of these factors, and in particular the express policies of LPD, any expectation of privacy that Mr. Miller had in his work phone was not objectively reasonable.  Accordingly, the Court concludes that Mr. Miller did not have a reasonable expectation of privacy in his work phone and cannot bring a Fourth Amendment challenge

to the seizure or search of it.  Accordingly, to the extent Defendant moves to suppress evidence obtained from his work phone, the Motion to Suppress is **DENIED**.

### B.    The Warrantless Seizure of Mr. Miller's Personal Phone

"When officers 'have probable cause to believe that a container holds . . . evidence of a crime,' they may seize it without a warrant if exigent circumstances exist." *Andersen v. DelCore*, 79 F.4th 1153, 1166 (10th Cir. 2023) (quoting *United States v. Place*, 462 U.S. 696, 701 (1983) (alteration in original)).  "Exigent circumstances" include the need to prevent deletion of evidence of a crime.  *Id.* (citing *Roaden v. Kentucky*, 413 U.S. 496, 505 (1973)).  Indeed, an officer may seize a cellphone without a warrant "to prevent the deletion of incriminating evidence that the officer had probable cause to believe existed on the cell phone."  *Id.*

Defendant argues that the seizure of his personal phone violated the Fourth Amendment because (1) the seizure not supported by probable cause; and (2) the seizure was not justified by exigent circumstances.  [Doc. 36 at 2].

### 1.    Probable Cause

"Warrantless seizures are presumptively unreasonable, so the Government bears the burden to prove otherwise."  *United States v. Colbert*, No. 23-cr-40019-TC-1, 2024 WL 2091995, at *5 (D. Kan. May 9, 2024) (citing *United States v. Shrum*, 908 F.3d 1219, 1229 (10th Cir. 2018)).  Probable cause exists if "the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and that the person or property was involved in the crime."  *Patel v. Hall*, 849 F.3d 970, 981 (10th Cir. 2017) (quotation omitted).  The

relevant inquiry is whether there was a "substantial probability" that the "property was involved in a crime." *Id.* (quotation omitted).

When evaluating the evidence presented with a motion to suppress, the "district court must assess the credibility of witnesses and determine the weight to give to the evidence presented" and "the inferences the district court draws from that evidence and testimony are entirely within its discretion." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020).   The Court considers all evidence "evenhandedly."  *United States v. Torres*, 987 F.3d 893, 899 (10th Cir. 2021).

Defendant argues that there was no probable cause supporting the warrantless seizure of his personal phone because nothing in his interview with Sergeant Servin gave rise to probable cause—he "denied remembering [Minor #1] and the alleged incident." [Doc. 36 at 3].  He argues that Sergeant Servin had no reason to believe that Defendant and Minor #1 had ever communicated using Defendant's cellphone, [*id.*], and to the extent officers believed the phone contained GPS location data, they could have obtained that same evidence via cell tower data, [*id.* at 4].  The Government responds that officers had probable cause to investigate Defendant for a violation of 18 U.S.C. § 242 and that Mr. Miller's cellphone "contained potentially alterable information such as location information on the dates in question, searches related to Minor #1, or communications related to interactions with Minor #1."  [Doc. 40 at 3–4].

At the hearing, Sergeant Servin testified that during her interview with Minor #1, Minor #1 stated that she noticed Defendant was wearing what she believed to be an Apple watch during the encounter.  [Hearing Tr. at 106:6–8].  And during the LCSO interview, Mr. Miller confirmed he previously wore a Garmin watch until about three weeks prior to

the interview.  [Doc. 35-1 at 08:42:56–43:17].   In her testimony, Sergeant Servin explained that she believed the phone may have stored data from the watch that could be evidence of illegal activity.  [Hearing Tr. at 144:14–19]; *see also* [*id.* at 121:8–23 ("I was looking to see if he any changes in his physical data during the time that he was reporting to be getting oral sex, also to see if [he] had made any phone calls or was on the internet during that time that he was sitting at North Lake Park. . . .  [I]f his phone would have shown that he was either taking phone calls or on the internet, then obviously he wouldn't have been with her that entire time, so I was looking to see if there is any exculpatory information on his phones for that time period as well.")].  She also believed that the phone could contain location data demonstrating whether Mr. Miller was indeed at North Lake Park at the time of the assault.  [*Id.* at 121:24–122:2].

At the hearing, the Government conceded that, at the time of the seizure, there was no evidence that the phone had been used to communicate with Minor #1 or that Defendant had any pictures or videos of Minor #1 stored on the phone.  [*Id.* at 159:16–160:5].  However, the Government asserted that there was probable cause to believe that evidence of the crime existed on the phone because smart watch activity data could have been in the phone, which could have been used to corroborate Minor #1's report.  [*Id.* at 157:16–21, 159:11–15].  The Government also argued that there was probable cause to believe that location data placing Mr. Miller at North Lake Park at the time of the assault would be found on Mr. Miller's personal phone.  [*Id.* at 157:9–15, 159:12–15].

The Court concludes that a reasonable officer would have probable cause to believe that Mr. Miller's personal phone contained evidence of the charged crime, based on the following facts:

- Sergeant Servin knew of several facts implicating Mr. Miller, including Minor #1's identification of Defendant and Minor #2's corroboration of her report.  [Hearing Tr. at 109:18–110:19, 111:6–17].

- Mr. Miller was working the night of August 3, 2023.  [Hearing Tr. at 113:18–19].

- Defendant's MDT demonstrated that Defendant was in North Lake Park from approximately midnight to 1:30 A.M. on August 4, 2023.  [*Id.* at 113:6–17].

- Minor #1 reported that Defendant wore a smart watch during the alleged assault.  [*Id.* at 106:6–8].

- Minor #1 reported that during the alleged offense, Defendant moved his vehicle and had taken off his body-worn camera and name plate.  [*Id.* at 104:11–23].

- Sergeant Servin knew that the phone could contain smart watch activity data from the time of the alleged assault.  [*Id.* at 121:8–15].

- Mr. Miller had advised that he kept his personal phone in his patrol vehicle while at work.  [Doc. 35-1 at 09:00:55–01:12 (Mr. Miller stating that, at work, he keeps his personal phone "in [his] car")]; *see also* [*id.* at 07:59:46–55 (Mr. Miller explaining that he and his wife had "one car" at home); Hearing Tr. at 12:6–14:25 (Lieutenant Pyle discussing how the LPD has "take home vehicles" and Mr. Miller came to work that day in his patrol car)].[18]

- Sergeant Servin knew that the phone could contain location data placing Mr. Miller's phone at North Lake Park, further corroborating Minor #1's report.  [Hearing Tr. at 121:24–122:2].

---

[18] Thus, a reasonable officer would have had probable cause to believe that because Mr. Miller commuted from home to work in his patrol vehicle and kept his phone in his patrol vehicle, Mr. Miller's personal phone was in his patrol vehicle during the alleged assault.

Probable cause is a "flexible, common-sense standard," *Illinois v. Gates*, 462 U.S. 213, 239 (1983), and "is not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014). It "requires only a 'fair probability,' a standard understood to mean something more than a 'bare suspicion' but less than a preponderance of the evidence at hand." *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014). Taken together, the above facts would give a reasonable officer probable cause to believe that Mr. Miller's personal phone contained evidence of the alleged assault. *See United States v. Batista*, No. 23-6204, 2024 WL 5053262, at *4 (10th Cir. Dec. 10, 2024) (finding probable cause supporting warrantless seizure of phone where agent "knew of several facts implicating [the defendant]" in the crime and the defendant referenced information that "could reasonably be expected to be found on [his] phones" during his interview with law enforcement).

To be clear, this Court's ruling should not be construed as a determination that if a suspect possesses a phone during the alleged commission of a crime, there will *always* be probable cause to seize the phone because it may contain location data. Such a sweeping legal principle is not warranted. But considering the particular factual circumstances of this case, the Court finds that probable cause supported the warrantless seizure of the phone.

### 2.    Exigent Circumstances

In the alternative, Defendant argues that there were no exigent circumstances justifying the warrantless seizure because "[t]here was no evidence that Servin, or anyone, had a concern about the destruction of evidence," as Defendant followed the orders of his supervisors and the LCSO officials and Minor #1 "provided no evidence that Mr. Miller would engage in the destruction of evidence." [Doc. 36 at 4].

Defendant cites no authority for the proposition that there must be some affirmative evidence that the suspect in question will destroy evidence for exigent circumstances to arise.  See [*id.*].  The Court is respectfully unpersuaded that any such requirement exists. In two recent cases, the Tenth Circuit concluded that exigent circumstances justified the warrantless seizure of a phone.  In *Andersen v. DelCore*, the Tenth Circuit found exigent circumstances where the suspect refused to turn over his cellphone, demonstrating that there was evidence on the phone that the suspect was "eager to keep from" law enforcement.  79 F.4th at 1167.  In *United States v. Batista*, after concluding that there was probable cause to believe that the defendant's cellphones contained criminal evidence, and noting that the defendant was not placed in custody, the Tenth Circuit stated that it was "persuaded that the warrantless seizure was permissible 'to prevent the deletion of incriminating evidence that the officer had probable cause to believe existed on the cell phone.'"  2024 WL 5053262, at *4 (quoting *Anderson*, 79 F.4th at 1166).  Based on this authority, there is no obvious requirement that there be some specific evidence that the specific suspect is likely to delete evidence; rather, there must be (1) probable cause to believe that evidence existed on the phone; and (2) an opportunity for the suspect to delete the evidence if given the chance.

At the hearing, Sergeant Servin testified that she knows a cellphone user can effectuate a "factory reset" of the phone, which would essentially "wipe all of the data out of the cellphone."  [Hearing Tr. at 122:3–10].  She explained that although deleted data can sometimes be recovered during a forensic download, a factory reset will preclude any ability to collect data from a phone.  [*Id.* at 122:10–15].  Sergeant Servin also testified that she was worried that Mr. Miller "would factory reset his phone before [she] had an

opportunity to get a search warrant for the collection of his phone." [*Id.* at 122:17–21]. Moreover, at the conclusion of Sergeant Servin's interview, Mr. Miller knew that he had been placed on administrative leave, was accused of sexually assaulting a minor, was under criminal investigation, and that the LCSO had obtained evidence implicating him in the crime. [*Id.* at 17:2–7; Doc. 35-1 at 08:45:00–8:46:40].

Because there was probable cause that evidence of a crime was on Mr. Miller's phone, and because Mr. Miller—who was under investigation for sexual assault of a minor—was not taken into custody at the conclusion of the interview (such that he would have an opportunity to destroy evidence or perform a factory reset of the phone), officers were permitted to seize the phone without a warrant to prevent the deletion of potentially incriminating evidence. *Batista*, 2024 WL 5053262, at *4; *Anderson*, 79 F.4th at 1166.

## C.    Challenges to the Warrants[19]

Defendant next argues that several search warrants issued during the investigation in this case failed to comply with the Fourth Amendment because many were overbroad and/or insufficiently particular (or, in other words, too general). *See* [Doc. 36 at 5–8]. He also asserts that many of the warrants are not supported by probable cause. *See generally* [Doc. 36-1].

---

[19] In addition to the warrants discussed below, Defendant also raises arguments challenging a warrant signed December 13, 2023, [Doc. 36-4 (Defendant's Exhibit D)], a warrant signed March 12, 2024, [Doc. 36-11 (Defendant's Exhibit K)], and a warrant signed April 11, 2024, [Doc. 36-13 (Defendant's Exhibit M)]. The Government stipulates that it will not seek to introduce evidence obtained pursuant to those warrants at trial. *See* [Doc. 40-1 at 1–2, 8]. Accordingly, the Court finds that Defendant's arguments with respect to these warrants are moot, and the Court does not address them further. *See United States v. Mikolon*, 719 F.3d 1184, 1189 (10th Cir. 2013).

### 1.    Legal Standards

### a.    Probable Cause

A search warrant may only issue if supported by probable cause, which exists if the supporting affidavit "provide[s] a substantial basis to conclude that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Long*, 774 F.3d 653, 658 (10th Cir. 2014); *see also* U.S. Const. amend. IV.  "Probable cause is a 'flexible, common-sense standard,'" and so the Court "'must interpret the Government's affidavit in a flexible, common-sense way.'"  *United States v. Bullcoming*, 22 F.4th 883, 891 (10th Cir. 2022) (quoting *United States v. Biglow*, 562 F.3d 1272, 1282 (10th Cir. 2009)).  Probable cause requires "more than mere suspicion but less evidence than is necessary to convict."  *United States v. Chambers*, 882 F.3d 1305, 1310 (10th Cir. 2018) (quotation omitted).  "An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place."  *Bullcoming*, 22 F.4th at 891 (quotation omitted).

"In reviewing whether a warrant was sufficient, th[e] Court accords 'great deference to the issuing judge's finding of probable cause,' asking 'only whether, under the totality of the circumstances presented in the affidavit,' the issuing judge 'had a substantial basis for determining that probable cause existed.'"  *United States v. Pena*, No. 22-2154, 2024 WL 2264137, at *3 (10th Cir. May 20, 2024) (quoting *United States v. Haymond*, 672 F.3d 948, 958–59 (10th Cir. 2012)).  If the challenged search or seizure was made pursuant to a warrant, then the defendant bears the burden to demonstrate a Fourth Amendment

violation.  *United States v. Thomas*, 290 F. Supp. 3d 1162, 1172–73 (D. Colo. 2017) (citation omitted).

### b.   Particularity and Breadth

The Fourth Amendment requires "not only that the warrant sufficiently specify the evidence to be seized, but also that the scope of the warrant be limited to the specific areas and things for which there is probable cause to search."  *United States v. Leary*, 846 F.2d 592, 605 (10th Cir. 1988).  In other words, a search warrant may fail to comply with the Fourth Amendment if it is too general (i.e., if it lacks sufficient particularity) or too broad.  *United States v. Cotto*, 995 F.3d 786, 798 (10th Cir. 2021).

The Fourth Amendment's "particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."  *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985).  "The test applied to the description of the items to be seized is a practical one."  *Leary*, 846 F.2d at 600.  A warrant must "describe the items to be seized with as much specificity as the government's knowledge and circumstances allow."  *United States v. Sells*, 463 F.3d 1148, 1154 (10th Cir. 2006) (quotation omitted).  A warrant meets the particularity requirement if its description "enables the searcher to reasonable ascertain and identify the things authorized to be seized."  *United States v. Pulliam*, 748 F.3d 967, 972 (10th Cir. 2014).  But a warrant is too general if it "vest[s] the executing officers with unbridled discretion to conduct an exploratory rummaging through the defendant's property in search of criminal evidence."  *Cotto*, 995 F.3d at 798 (cleaned up).

As for breadth, a warrant is overbroad if it "describes in both specific and inclusive generic terms what is to be seized, but it authorizes the seizure of items as to which there

is no probable cause." *Cotto*, 995 F.3d at 798 (quotation omitted).  But even a "warrant that describes items to be seized in broad and generic terms may be valid if the description is as specific as circumstances and nature of the activity under investigation permit." *United States v. Harris*, 903 F.2d 770, 775 (10th Cir. 1990).  And even if a warrant is overbroad, "evidence should be suppressed only as 'a last resort, not a first impulse.'" *United States v. Gaye*, No. 23-1240, 2025 WL 758570, at *3 (10th Cir. Mar. 10, 2025) (quoting *Sells*, 463 F.3d at 1154).

### 2.   Defendant's Challenges

Defendant raises broad warrant-based arguments in his Motion to Suppress, challenging both the particularity and breadth of the subject warrants.  *See* [Doc. 36 at 4–8].  For the most part, he does not raise any specific arguments tailored to any particular warrants in the Motion; instead, he has attached a chart to his Motion that he says sets forth "the warrants and stated objections thereto."  [*Id.* at 6]; *see also* [Doc. 36-1].  But the arguments raised in Defendant's chart are largely conclusory, lacking any supporting argument or supporting legal authority.  *See* [Doc. 36-1].  And notably, despite the fact that he argues in his chart that a number of the warrants lack probable cause, he fails to set forth *any* legal authority with respect to the law governing probable cause for search warrants in his actual Motion to Suppress.  *See* [Doc. 36].

The Court would be well within its discretion to deem most of Defendant's arguments waived.  *See United States v. Martinez*, 518 F.3d 763, 768 (10th Cir. 2008) ("But this contention appears only in a fleeting sentence at the conclusion of Mr. Martinez's opening brief, supported by no analysis or citation; without any such development, our precedent instructs us to deem the point waived and leave any such

challenge for another day."); *United States v. Espinoza-Moreno*, No. 13-cr-00142-REB, 2015 WL 12857315, at *1 (D. Colo. Aug. 6, 2015) ("[T]he motion . . . fails to particularly describe how any one or more of the warrants challenged herein run afoul of [Fourth Amendment] principles.  Just as failure to make a pretrial motion to suppress evidence results in waiver, . . . failure to include a particular argument in the motion likewise constitutes a waiver." (quotation omitted)).   But the Government has responded to Defendant's arguments with its own chart, *see* [Doc. 40-1], and so the Court resolves Defendant's objections to the best of its ability.[20]

### a.    January 1, 2024 Warrant [Doc. 36-5 (Exhibit E)]

This warrant authorized a search of raw extractions from Mr. Miller's work phone. [Doc. 36-1 at 1; Doc. 36-5 at 2; *id.* at 14 ¶ 35].   Defendant argues that this warrant is overbroad, insufficiently particular, and unsupported by probable cause.  [Doc. 36-1 at 1– 2].   Among other arguments directed at the warrant's contents, the Government asserts that "the defendant had no expectation of privacy in his department issued cell phone that was at issue in Defendant's Exhibit E."  [Doc. 40 at 4].

The Court agrees with the Government.  For the reasons explained above, Mr. Miller had no objectively reasonable expectation of privacy in his work phone.  He thus cannot bring a Fourth Amendment challenge to the warrant authorizing a search of the phone.  *See United States v. Streett*, 363 F. Supp. 3d 1212, 1309 (D.N.M. 2018) ("[I]f a person has no reasonable expectation of privacy in the information seized, there has been

---

[20] Defendant attached another chart to his reply brief, which attempts to develop some of Defendant's cursory arguments.  *See, e.g.*, [Doc. 62-1 at 7 (Defendant making an argument "[i]n addition to [his] previous arguments")].   The Court does not consider arguments raised for the first time in a reply brief that could have been raised in Defendant's Motion.  *See United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019).

no search -- and no warrant supported by probable cause is needed."), *aff'd*, 83 F.4th 842 (10th Cir. 2023); *see also United States v. Ruiz*, 664 F.3d 833, 838 (10th Cir. 2012) ("A search only violates an individual's Fourth Amendment rights if he or she has a 'legitimate expectation of privacy in the area searched.'" (quoting *Anderson*, 154 F.3d at 1229)).

<strong>b.   First February 7, 2024 Warrant [Doc. 36-6 (Exhibit F)]</strong>

The search warrant designated as Defendant's Exhibit F authorizes a search of Defendant's MDT laptop.  [Doc. 36-6 at 2].  Defendant argues that there was "no probable cause to justify the search of the MDT laptop" because there were no allegations "that Mr. Miller violated Loveland Police Department policies or administrative regulations that pertain to his MDT."  [Doc. 36-1 at 2].  The Government responds that Defendant did not have a reasonable expectation of privacy in the laptop based on LPD Policy Number 5.06. [Doc. 40-2 at 3; Doc. 40-1 at 4–5].  Defendant does not respond to this argument.  *See* [Doc. 62 at 4–5 (arguing only that he had a reasonable expectation of privacy in his work *phone*); Doc. 62-1 at 3].

For the reasons discussed above, the Court agrees with the Government that Defendant had no reasonable expectation of privacy in his MDT laptop.  LPD Policy Number 5.06 makes clear that LPD employees do not have an expectation of privacy in department-issued devices, [Doc. 40-2 at 3; Hearing Tr. at 68:24–69:3], and the MDT laptops are "hard mounted" into LPD patrol cars, [Hearing Tr. at 69:4–11].  Even if Defendant had a subjective expectation of privacy in the laptop, that expectation is not objectively reasonable.  *Angevine*, 281 F.3d at 1135.  Accordingly, Defendant does not have standing to bring a Fourth Amendment challenge to the search of the laptop or the warrant.  *Ruiz*, 664 F.3d at 838.

c.    Second February 7, 2024 Warrant [Doc. 36-7 (Exhibit G)]

Exhibit G is a warrant authorizing the search of forensic extractions from Defendant's personal cellphone for the purpose of identifying records "that relate to a violation of 18 U.S.C. § 242 . . . and involve Dylan MILLER since July 15, 2023." [Doc. 36-7 at 2–3].

**Probable Cause.**    Defendant contends that "[t]here is no probable cause to support the overly broad, vague and confusing categories of evidence listed in Attachment B, such as:  j.  'Evidence concerning efforts after the fact to conceal evidence of the Subject Offense, or to flee prosecution for the same.'" [Doc. 36-1 at 4].  Defendant makes no specific argument explaining why there was no probable cause to support this portion of the search.  *See* [*id.*].  Any probable cause argument is thus waived.  *See United States v. Palms*, 21 F.4th 689, 698 (10th Cir. 2021) (deeming probable cause argument waived where the appellant did not "identify probable cause as one of the issues on appeal, describe the requirements for determining probable cause, cite any cases, or apply the facts to his probable cause argument").

Even considering the argument, and affording great deference to the magistrate judge's determination of probable cause, the Court concludes that the magistrate judge had a substantial basis for concluding that evidence of concealment of the crime may be located on Mr. Miller's phone.  *Long*, 774 F.3d at 658.  The agent states in the affidavit that, based on his experience and training, he "know[s] that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, . . . or by giving them deceptive names."  [Doc. 36-7 at 5–6 ¶¶ 2–3, 25 ¶ 54(g)].  The affidavit explains how cellphones store data, and that deleted or edited data can be

identified or restored.  [*Id.* at 17 ¶ 46, 22–23 ¶¶ 51–53].  The affidavit also describes facts from which the magistrate judge could draw a reasonable inference of a lack of forthrightness or an attempt to conceal evidence on the part of Mr. Miller.  *See* [*id.* at 13 ¶ 33 (noting that Mr. Miller denied recognizing Minor #1 and stated he did not remember ever having contact with her); *id.* at 16 ¶ 42 (a search of Mr. Miller's vehicle revealed a notebook containing Minor #1's name and birthdate); *id.* at 10 ¶ 18 (a week before the alleged assault, Mr. Miller spoke with Minor #1 outside of her home); *id.* at 11 ¶¶ 23, 25 (other witnesses corroborating this account)].  These facts are sufficient to create probable cause.

**Overbreadth.**  Defendant next argues that the warrant was not supported by probable cause "to justify the broad time range" because "[t]here was never any accusation of a sexual assault and/or a violation of § 242 until August 4, 2023."  [Doc. 36-1 at 4].  The Court finds this argument more appropriately framed as an overbreadth argument; indeed, Defendant essentially argues that the provided timeframe "authorizes the seizure of items as to which there is no probable cause."  *Cotto*, 995 F.3d at 798; *see* [Doc. 36-1 at 4].  The Government responds that the date range "is reasonably tailored to approximately ten days prior to [Defendant's] first known contact with Minor #1, and the weeks after [Defendant] was informed of the allegations and the investigation."  [Doc. 40-1 at 6].[21]

---

[21] Defendant interprets the warrant as permitting the search of records from July 15, 2023 to February 7, 2024, the date the warrant was signed.  [Doc. 36-1 at 4].  The Government asserts that the search was limited to the range of July 15, 2023 through November 15, 2023, the date the forensic extraction was created.  [Doc. 40-1 at 5–6]; *see also* [Doc. 36-7 at 17 ¶ 45 ("The Device was created through imaging by Criminalist Colby Duvel on November 15, 2023.")].  No matter the correct timeframe, the Court's analysis remains the same.

The Court finds that the date range does not render the warrant unconstitutionally broad.  The affidavit sets forth facts detailing that, on July 27, 2023, Defendant pulled over a car full of minors, including Minor #1.  [Doc. 36-7 at 10–11 ¶¶ 18, 23].  Defendant then followed the vehicle to each of the occupants' homes and spoke with Minor #1 in front of her home "for several minutes."  [*Id.* at 10 ¶ 18].  Defendant does not explain why a date range starting 12 days prior to Defendant's alleged contact with Minor #1 is unreasonable, [Doc. 36-1 at 4], and the Court concludes that permitting a search for data from shortly before this contact does not render the warrant overbroad, *cf. United States v. Trujillo*, No. 22-cr-00213-CMA, 2023 WL 1927999, at *7 (D. Colo. Feb. 10, 2023) ("There is no requirement under the Fourth Amendment that a warrant specify a date range at all."), *aff'd*, No. 23-1318, 2024 WL 3594234 (10th Cir. July 31, 2024); *United States v. Ortega*, No. 21-cr-00665-MV, 2023 WL 2712533, at *3 (D.N.M. Mar. 30, 2023) (observing that requiring a warrant to identify a timeframe "would inject the kind of technical precision the Fourth Amendment does not require").  Moreover, Defendant makes no clear argument challenging the end date of the applicable timeframe.  [Doc. 36-1 at 4].  Even though the applicable date range extended a few months—either to November 2023, in the Government's view, or to February 2024, in Defendant's view—the Court still finds that the warrant is not overly broad because it does not "authorize[] the seizure of items as to which there is no probable cause."  *Cotto*, 995 F.3d at 798.

Turning to Defendant's other overbreadth arguments, Defendant also argues that the search warrant is "overbroad and lacking in particularity because it seeks to obtain a sweeping amount of data from Mr. Miller's work phone over a broad range of time."  [Doc. 36-1 at 4].  The Court observes, however, that this warrant relates to Defendant's personal

cellphone—not his work phone.[22]  *See* [Doc. 36-7 at 2, 14 ¶ 34])].  Defendant does not expound on his argument or cite legal authority in support in his chart, but in his Motion, he argues that this warrant is overbroad because "[e]vidence of the alleged single act of sex assault on August 4, 2024, does not allow the searching officers *carte blanche* to search and seize everything that they believe might pertain to sex assault."  [Doc. 36 at 8].  His argument is based on the warrant's request to search for "[a]ll records on the Device . . . that relate to a violation of 18 U.S.C. § 242 . . . and involve Dylan MILLER since July 15, 2023."  [Doc. 36-7 at 3; Doc. 36 at 8].  He asserts that an "unadorned reference to a broad federal statute does not sufficiently limit the scope of a search warrant."  [Doc. 36 at 7 (quoting *Leary*, 846 F.2d at 602)].

In *Leary*, the Tenth Circuit found a warrant overbroad because it permitted the search and seizure of "[c]orrespondence, Telex messages, contracts, invoices, purchase orders, shipping documents, payment records, export documents, packing slips, technical data, recorded notations, and other records and communications relating to the purchase, sale and illegal exportation of materials in violation of" two statutes.  846 F.2d at 594.  The Tenth Circuit concluded that "[a]bsent other limiting factors," a warrant containing just "[a]n unadorned reference to a broad federal statute does not sufficiently limit the scope of a search warrant."  *Id.* at 602.  And the Tenth Circuit found that the list of business records to be seized was not a sufficient limiting mechanism because the warrant "encompassed virtually every document that one might expect to find in a modern export company's office."  *Id.*

---

[22] And as previously discussed, Defendant has no reasonable expectation of privacy in his work phone.  *See supra* Section V.A.

*Leary* is distinguishable.  In this case, the warrant does not "encompass[] virtually every" record that could be found on a cell phone; rather, it contains specific limiting principles narrowing the type of evidence subject to the search.  Those limitations include records of electronic communications between Defendant and Minor #1, evidence that Defendant was present at North Lake Park on the night in question, or records pertaining to Defendant's traffic stop of the minors.  *See* [Doc. 36-7 at 3]; *see also United States v. Brooks*, 427 F.3d 1246, 1253 (10th Cir. 2005) ("[W]e are faced with a warrant that authorized officers to search through computer files for particular items specifically related to child pornography. . . .  While the warrant could have been more artfully written, we are satisfied on these facts that it falls within the particularity requirement of the Fourth Amendment."); *United States v. Whitmore*, No. 20-cr-40004-TC, 2021 WL 2604971, at *6 (D. Kan. June 24, 2021) ("The context and structure of the warrant confirms that the limitation to the crime of bank robbery was intended to and would be reasonably understood as a limit on any search.").  The warrant does not "authorize[] the seizure of items as to which there is no probable cause," *Cotto*, 995 F.3d at 798, and is not overbroad.

***Particularity.***  Defendant next argues that the warrant is "impermissibly broad, vague and confusing" to the extent it authorizes a search for "Evidence of MILLER's state of mind as it relates to the Subject Offense, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation."  [Doc. 36-1 at 4 (quoting [Doc. 36-7 at 3])].  The Court construes this as an argument that this category of evidence is insufficiently particular.  For cellphone searches, "warrants may pass the particularity test if they limit their scope

either to evidence of specific federal crimes or to specific types of material." *United States v. Russian*, 848 F.3d 1239, 1245 (10th Cir. 2017) (quotation omitted).  So long as the Court "can discern some 'limiting principles' to the warrant, 'broad authorization[s]' are permissible."  *United States v. Salas*, 106 F.4th 1050, 1057 (10th Cir. 2024 (quoting *Palms*, 21 F.4th at 698 (quotation omitted)).

This warrant meets these standards with respect to the challenged category of evidence.  "To be sufficiently particular, search warrants do not have to identify specific statutes for the crimes to which they are limited."  *Palms*, 21 F.4th at 698–99.  Here, though, the search warrant does, authorizing a search for evidence of Defendant's state of mind "as it relates to the Subject Offense," [Doc. 36-7 at 3], which is defined as a violation of 18 U.S.C. § 242, [*id.*]; *see also* [*id.* (limiting search to evidence of Defendant's state of mind "related to the criminal activity under investigation")].  Moreover, the warrant limited the type of evidence to be searched—evidence relating to Defendant's state of mind (for example, evidence of planning).  While this could capture a wide swath of evidence, this broad authorization is permissible under Tenth Circuit authority due to the limiting principles therein.  *Russian*, 848 F.3d at 1245; *see United States v. Lustyik*, No. 2:12-cr-00645-TC, 2014 WL 1494019, at *7 (D. Utah Apr. 16, 2014) (limitation that documents seized must relate to the crimes being investigated "was more than sufficient to limit the scope of the warrants"); *Ortega*, 2023 WL 2712533, at *3 (finding warrant sufficiently particular where it limited search to cellphone records "that relate[d] to violations of 21 U.S.C. § 841 and 18 U.S.C. § 924(c)," as this was a "limiting principle [instructing] that officers were only permitted to search and seize evidence relating to the two federal drug and firearm offenses charged").

**d.    Third February 7, 2024 Warrant [Doc. 36-8 (Exhibit H)]**[23]

Defendant's Exhibit H is a warrant that authorizes the search of cell tower records and information associated with Plaintiff's personal phone.  [Doc. 36-8 at 2].  It authorizes the seizure of certain categories of information "for the time period July 15, 2023 to October 27, 2023."  [*Id.* at 3].

***Overbreadth.***  Defendant argues that this search warrant is too broad because "it begins on July 15, 2023, when the only alleged offense occurred on August 4, 2023." [Doc. 36-1 at 5].  But as explained above and explained in the warrant's affidavit, there is evidence that Defendant had direct contact with Minor #1 as early as July 27, 2023, and was observed getting out of his duty vehicle to talk with Minor #1 at her home when dropped off during the earlier encounter.  [Doc. 36-8 at 15 ¶¶ 34–35].  The Court cannot conclude that the warrant is impermissibly overbroad simply because it permits a search of data from shortly before that contact.  In addition, Defendant argues that the warrant is overbroad "because it seeks to obtain a sweeping amount of data from Mr. Miller's personal phone."  [Doc. 36-1 at 5].  This general and conclusory argument "fails to particularly describe how [the warrant] run[s] afoul of" the Fourth Amendment.  *Espinoza-Moreno*, 2015 WL 12857315, at *1.  "[C]onclusory arguments are insufficient to create an obligation on the part of this court to consider them substantively."  *Id.*   Because

---

[23] Defendant states that "[t]here is no probable cause to support the overly broad, vague and confusing categories of evidence listed in Attachment B, such as:," but does not list any examples of the categories of evidence he challenges.  [Doc. 36-1].  The Court thus does not construe Defendant's argument as asserting a lack of probable cause.  And even if the argument were so construed, the Court finds it insufficiently developed and waived. *Palms*, 21 F.4th at 698.

Defendant's argument is undeveloped and unsupported by legal authority, the Court concludes that Defendant has not met his burden to demonstrate overbreadth.

**Particularity.**   Alternatively, Defendant argues that the warrant is too general because "all of the items to be seized are described in overly general terms."  [Doc. 36-1 at 5].   This argument too is insufficiently developed.   *Espinoza-Moreno*, 2015 WL 12857315, at *1.  In any event, the Court has reviewed the items to be seized, [Doc. 36-8 at 3–4], and concludes that they have a number of limiting principles, such as the type of evidence to be seized and a date range for the permissibly seized data, which render the search warrant sufficiently particular, *Salas*, 106 F.4th at 1057.

### e.    February 9, 2024 Warrant [Doc. 36-9 (Exhibit I)]

This search warrant seeks cell tower records associated with Defendant's work phone.  [Doc. 36-9 at 2; Doc. 36-1 at 5].  Defendant's argument with respect to this search warrant is as follows:

> The same more narrow date range from Attachment B above (July 15, 2023 to October 27, 2023) is listed in the Attachment B to this warrant.  In fact, Attachments A and B to this warrant include the exact same working [sic] as the warrant listed above.  The only difference is that this warrant is for cell tower records from the Department issued phone and the warrant above is for cell tower records for Mr. Miller's personal phone.

> The same objections apply here as those stated above.

[Doc. 36-1 at 5–6].  Though unclear, the Court assumes that Defendant's incorporation of "above" objections refers to the objections lodged against the search warrant designated as Defendant's Exhibit H (the third February 7, 2024 warrant), [Doc. 36-8].

Neither Party discusses whether Defendant has a reasonable expectation of privacy in the cell tower records associated with his work phone.  *See* [Doc. 36; Doc. 36-1; Doc. 40; Doc. 40-1].  Even assuming he has a privacy interest in that location data, the

Court rejects Defendant's undeveloped arguments for the reasons articulated above with respect to the third February 7, 2024 warrant.  *See supra* Section V.C.2.d.

### f.    March 6, 2024 Warrant [Doc. 36-10 (Exhibit J)]

The search warrant designated as Exhibit J authorizes a search of Mr. Miller's personal and work phones.  [Doc. 36-10 at 14 ¶ 34; Doc. 36-1 at 6].  Defendant raises "the same objections that apply to Warrant #2 (Exhibit E) and Warrant # 4 (Exhibit G), with the caveat that this objection also includes the fact that this warrant covers a longer time frame."  [Doc. 36-1 at 6].

First, insofar as this warrant authorizes the search of Mr. Miller's work phone, he has no standing to bring a Fourth Amendment challenge because he has no expectation of privacy in that device.  Second, with respect to Defendant's attempt to incorporate the objections lodged against the warrant designated as Exhibit G, the Court overrules those objections for the same reasons it rejected the arguments as to Exhibit G (the second February 7, 2024 warrant).  *See supra* Section V.C.2.c.[24]

As for Defendant's attempt to incorporate objections raised in the context of Exhibit E (the January 25, 2024 warrant), Defendant argued in the context of Exhibit E that (1) that there was no probable cause authorizing a search of data "since July 2023," [Doc. 36-1 at 1]; (2) there was "no probable cause to support the overly broad, vague and confusing categories of evidence listed in Attachment B, such as . . . 'Evidence concerning efforts after the fact to conceal evidence of the Subject Offense, or to flee prosecution for the same,'" [*id.* at 1–2]; and (3) "the categories in Attachment B are impermissibly broad,

---

[24] Accordingly, the Court does not address Defendant's incorporated argument that the warrant is overbroad because it "seeks to obtain a sweeping amount of data from Mr. Miller's work phone."  [Doc. 36-1 at 2, 6].

vague and confusing," pointing to two categories of evidence: "Records and information concerning any sexual or otherwise inappropriate relationships between MILLER [sic]" and "Evidence of MILLER's state of mind as it relates to the Subject Offense, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation," [*id.* at 2].

The Court has already addressed Defendant's first two arguments in the context of other warrants and, for the reasons explained above, finds those arguments equally unpersuasive with respect to Exhibit J.[25]  *See* [Doc. 36-10 at 5–6 ¶¶ 2–3, 10 ¶ 18, 11–12 ¶¶ 23–25, 13 ¶ 33, 14 ¶ 35, 18 ¶¶ 47–48, 28 ¶ 61(g) (the affidavit setting forth facts from which an inference could be drawn that Defendant attempted to conceal facts, as he denied ever having contact with Minor #1 and Minor #2)].  It has also already addressed his overbreadth argument with respect to the category of evidence related to Mr. Miller's state of mind, *see* Section V.C.2.c, and rejects that argument for the reasons set out above.  As for Defendant's final incorporated argument that the category of evidence related to "any sexual or otherwise inappropriate relationships" is broad or too general, this category of evidence is not included in the March 6, 2024 warrant.  *See* [Doc. 36-10 at 3–4].

### g.   March 26, 2024 Warrant [Doc. 36-12 (Exhibit L)]

---

[25] To the extent Defendant asserts that "this objection also includes the fact that this warrant covers a longer time frame" and could argue that the Court's above analysis related to a slightly shorter timeframe does not sufficiently address the longer timeframe contemplated in the March 6, 2024 warrant, he fails to develop any argument with respect to the specific timeframe, and any such argument is waived.  Moreover, "[t]here is no requirement under the Fourth Amendment that a warrant specify a date range at all." *Trujillo*, 2023 WL 1927999, at *7.

This search warrant authorizes the search of cell tower records associated with Mr. Miller's work phone. [Doc. 36-12 at 2, 14 ¶ 32]. Defendant asserts that "the same objections apply here that apply to Warrant #1 (Exhibit D), Warrant #5 (Exhibit H), and Warrant #6 (Exhibit I)." [Doc. 36-1 at 7]. Again, the Parties do not raise arguments about whether Defendant has a privacy interest in the cell tower records associated with his work phone, and the Court will not make arguments on the Parties' behalf. *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015).

Even assuming Defendant has a privacy interest in the location data, he has not met his burden here. The arguments presented with respect to Exhibit H and Exhibit I have been deemed waived. *See supra* Section V.C.2.d–e. As for the Defendant's incorporation of arguments raised in the context of Exhibit D, those arguments are similarly undeveloped. Defendant argued that a December 13, 2023 warrant (Exhibit D) was (1) unsupported by probable cause "to establish that any evidence of the § 242 violation . . . would be found for the broad date range" and was (2) "overbroad and lacking in particularity because it [sought] to obtain a sweeping amount of data for Mr. Miller's work phone for a period of three months." [Doc. 36-1 at 1]. These arguments do not adequately present any Fourth Amendment issue to the Court, *Espinoza-Moreno*, 2015 WL 12857315, at *1, and are unpersuasive insofar as they challenge the date range associated with the warrant, *see supra* Section V.C.2.c.

### h. October 9, 2024 Warrant [Doc. 36-14 (Exhibit N)]

Exhibit N is a search warrant authorizing the search of records and information associated with the AT&T account linked to the in-car Wi-Fi system of a Ford Expedition registered to Defendant. [Doc. 36-14 at 2, 19 ¶ 43].

*Probable Cause.*  Defendant contends that "[t]his warrant fails due to a lack of probable cause and where [sic] Attachment B includes a laundry list of items to be seized over a period of three months, which includes a time frame that pre-dates the date of the alleged offense."  [Doc. 36-1 at 8].  The Court is respectfully unpersuaded by this argument for the reasons discussed in more detail above.  The warrant sets forth sufficient facts to seize data associated with the AT&T account for a limited amount of time predating the alleged assault, given that there is evidence that Defendant had direct contact with Minor #1 prior to the assault.  [Doc. 36-14 at 12 ¶ 17, 15 ¶ 31].  Moreover, to the extent Defendant challenges the date range—which is framed as a probable cause argument, but is more appropriately viewed as an overbreadth argument—the Court finds both that the warrant sets forth probable cause to believe that evidence would be found throughout the date range and that the date range does not render the warrant overbroad, given that the affidavit further sets forth averments suggesting additional contact (or attempted contact) between Defendant and Minor #1.  *See, e.g.,* [*id.* at 18 ¶¶ 40–42 (witness recounting alleged incident in which Defendant followed and pulled over Minor #1 and the witness in his personal vehicle); *id.* at 17 ¶ 39 ("FRIEND 4 described subsequent communications between herself and [Minor #1] in which [Minor #1] described to FRIEND 4 how she had noticed MILLER frequently driving by and sitting outside her residence in a non-police vehicle . . . and following her around in this same vehicle.")]; *see also Cotto*, 995 F.3d at 798.  As for Defendant's suggestion that there is no probable cause because the warrant "includes a laundry list of items to be seized," Defendant does not make any particularized argument explaining why there is no

probable cause to support the search or seizure of any particular items listed in the warrant, and any such argument is waived. [Doc. 36-1 at 8]; *Palms*, 21 F.4th at 698.

*Particularity.* Defendant also argues that '[t]he information to be seized is . . . overbroad and lacking in particularity, as demonstrated by the request for" "[e]vidence indicating the owner's/subscriber's state of mind as it relates to the Subject Offenses." [Doc. 36-1 at 8]. The Court construes this as a particularity argument and concludes that any ambiguity in this language is cured by looking to the search warrant affidavit, which is incorporated into the search warrant by reference. *See United States v. Suggs*, 998 F.3d 1125, 1135 (10th Cir. 2021) (explaining that a supporting affidavit can cure a warrant's lack of particularity if the affidavit is attached to the warrant and is expressly incorporated into the warrant); [Doc. 36-14 at 1]. The affidavit states that stored electronic data "may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation," such as "indicat[ing] the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement)." [Doc. 36-14 at 25 ¶ 61].

Finally, Defendant argues that "[t]he list of items are not supported by sufficient particularity" because the warrant "refers to 'all' data in each category." [Doc. 36-1 at 8]. Because computerized devices can "contain enormous amounts of information and relevant evidence can be stored in any location, the Fourth Amendment requires warrants for computer searches to affirmatively limit the search to evidence of specific crimes or specific types of material." *Palms*, 21 F.4th at 698 (cleaned up).

While the warrant's use of "all" may appear to permit broad seizure at a first glance, the Court is satisfied that the warrant has sufficient "limiting principles" that render the warrant permissible. *Salas*, 106 F.4th at 1057. This warrant is distinguishable from ones the Tenth Circuit has found invalid, such as a warrant permitting the seizure of "[a]ny and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer-related equipment." *United States v. Otero*, 563 F.3d 1127, 1130 (10th Cir. 2009). Here, the warrant permits the seizure of (1) wire and electronic communications; (2) sent or received by the "TARGET ACCOUNT," (3) "for the time period July 15, 2023 to October 27, 2023." [Doc. 36-14 at 3–4]. It then sets forth ten examples of such communications, such as "[a]ll" timing information, "[a]ll" historical communications, "[a]ll text message logs, and "[a]ll" web browsing history. [*Id.* at 4]. But these illustrative examples are still restricted by the overarching limiting language. *See United States v. Burgess*, 576 F.3d 1078, 1092 (10th Cir. 2009). The Court concludes that the warrant is sufficiently particular. *See Palms*, 21 F.4th at 694, 700 (search for "all digital evidence stored on removable storage and magnetic or electronic data contained in the contents of" a cellphone that was "related to the crime of [h]uman [t]rafficking" was sufficiently particular due to "the warrant's limitation to evidence of the crime of human trafficking"); *United States v. Harb*, No. 2:07-cr-00426-TS, 2009 WL 910777, at *7 (D. Utah Mar. 30, 2009) (illustrative list, qualified by subject matter limitation, was "sufficient to enable the searcher to reasonable ascertain and identify the things authorized to be seized").

In sum, Defendant has not demonstrated that any of the challenged warrants run afoul of the Fourth Amendment.

### D.    The Scope of the Search

Next, Mr. Miller contends that even if the "scope of the warrant was appropriately limited and particular," "the forensic analyst's complete dump of the phone exceeded the scope in execution."    [Doc. 36 at 8 (emphasis omitted and capitalization altered)]. Defendant does not identify the phone, report, or analyst to which he refers, nor does he cite to any evidence in support of this argument.  *See* [*id.* at 8–9].  The Court could assume that Defendant's argument relates to Special Agent Benjamin Harris's March 7, 2024 report—which is cited elsewhere in his Motion but is not expressly referenced within this section—because Defendant attaches no other report to his Motion (and does not otherwise make clear what report he references).  *See* [*id.*]; *see also* [*id.* at 6].  The March 7 report concerns the searches of Mr. Miller's work phone and personal phone, which were authorized by the March 6, 2024 warrant (Defendant's Exhibit J).  *See* [Doc. 36-2]; *see also* [Doc. 36-10].  This report details Special Agent Harris's <u>physical</u> search of the phones.  *See* [Doc. 36-2 at 1 ("For each device, SA Harris . . . manually scrolled through the device's applications and settings searching for evidence pertinent to Attachment B of the authorizing warrant.")].

Defendant argues that "the digital forensic analyst-officer that searched the phone took everything," even though "[t]he forensic tool he used has *a la carte* options and the ability to select a subset of data during analysis."  [Doc. 36 at 9].  According to Defendant, the unidentified report "provides the entire contents of the phone."  [*Id.*].  He argues that "a sweeping comprehensive search of data" is unreasonable, and the agent "needed to conduct a search limited to the warrant's authorization and stop."  [*Id.*].  The Government responds to Defendant's argument by "identifying the process that was employed for the

searches of both of the defendant's phones that were seized *prior to* a warrant authorized search." [Doc. 40 at 9–10 (emphasis added)]. The Government defends the process of forensically extracting data from Mr. Miller's phones, as well as the Government's search through that data. [*Id.* at 10–11]. Because the nature of Defendant's argument is unclear, it is similarly not clear whether the Government's argument is responsive to Defendant's challenge, which appears to be to the physical search of the phones. Defendant does not clarify his argument (or address it at all) in his Reply, despite having an opportunity to do so. *See generally* [Doc. 62].

The Court has reviewed Defendant's Motion, Exhibit J, and the March 7 report, and cannot ascertain any meaningful argument challenging the scope of the search detailed in the March 7 report. It is not this Court's duty to construct arguments on Defendant's behalf. *Davis*, 622 F. App'x at 759; *see also United States v. Pereda*, No. 18-cr-00228-CMA, 2018 WL 4006305, at *3 (D. Colo. Aug. 22, 2018) (rejecting defendant's argument where she "provided no facts to suggest that law enforcement's actions within her home . . . exceeded the scope of the warrant").

Moreover, the Court generally disagrees with Defendant's broad assertion that "in the absence of a particularized search method a sweeping comprehensive search of data will be deemed unreasonable." [Doc. 36 at 9]. "Determining whether a search exceeds the scope of its authorizing warrant is, like most inquiries under the Fourth Amendment, an exercise in reasonableness assessed on a case-by-case basis." *United States v. Loera*, 923 F.3d 907, 916 (10th Cir. 2019) (citing *Dalia v. United States*, 441 U.S. 238, 258 (1979)). For electronic searches, courts look at how the agents carried out the search, "that is, the reasonableness of the search method the government employed,"

and "whether the forensic steps of the search process were reasonably directed at uncovering the evidence specified in the search warrant." *Id.* at 917. "What that looks like depends on the particular facts of a given case." *Id.* at 920. In a case "where the electronic storage device is not well-organized and the most practical way to search it is through an item-by-item review, 'there may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders.'" *Id.* (quoting *Burgess*, 576 F.3d at 1094).

But in any event, "[t]o undertake any meaningful assessment of the government's search techniques . . . (the *how*), [the Court] would need to understand what protocols the government used, what alternatives might have reasonably existed, and why the latter rather than the former might have been more appropriate." *United States v. Christie*, 717 F.3d 1156, 1167 (10th Cir. 2013). Even if it were clear what search Mr. Miller is challenging, he does not make any meaningful argument explaining why the challenged search exceeded the scope of the authorizing warrant. He thus has not met his burden to demonstrate a Fourth Amendment violation. *See id.* (rejecting similar argument because without developed argument from the defendant, the court could not "assess rationally her challenge to the government's search procedures in this case").

Because Defendant has not demonstrated any Fourth Amendment violation, the Motion to Suppress Under the Fourth Amendment is respectfully **DENIED**.

**CONCLUSION**

For the reasons set forth above, it is **ORDERED** that:

(1)    The United States' Motion to Exclude Evidence of Minor #1's Other Sexual Behavior Under Federal Rule of Evidence 412 [Doc. 28] is **GRANTED in part** and **DENIED in part**;

(2)    The United States' Notice and Motion to Introduce Evidence Under Federal Rule of Evidence 404(b) [Doc. 31] is **GRANTED**;

(3)    Defendant's Motion to Exclude and Suppress All Privileged Communications and for a Forthwith Hearing [Doc. 34] is **DENIED**;

(4)    Defendant's Motion to Suppress Statements Obtained in Violation of Mr. Miller's Fifth Amendment Rights [Doc. 35] is **DENIED**;

(5)    Defendant's Motion to Suppress Evidence Obtained in Vioaltion [sic] of the Fourth Amendment and Request for a Forthwith Hearing [Doc. 36] is **DENIED**;

(6)    This Order shall be filed under Level 1 Restriction and viewable only by the Parties and the Court for a period of 14 days.  On or before **May 13, 2025**, the Parties shall meet and confer regarding proposed redactions that are necessary to protect the sensitive information of any minors related to this case and shall file their proposed redactions under Level 1 Restriction.  After the Court receives and reviews the Parties' proposed redactions, the Court will enter a redacted order;

(7)    On or before **May 28, 2025**, the Parties shall meet and confer with respect to the appropriate procedures to use during trial to maintain the anonymity

of Minor #1 and other minor witnesses and shall file a status report setting

forth their proposal on such procedures.

DATED:  May 6, 2025                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge