**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Criminal Action No. 24-cr-00083-NYW-1

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     DYLAN ANDREW MILLER,

      Defendant.

---

## ORDER ON POST-TRIAL MOTIONS

---

This matter is before the Court on Dylan Miller's Motion for Judgment of Acquittal ("Motion for Judgment of Acquittal"), [Doc. 211], and Dylan Miller's Motion for a New Trial ("Motion for New Trial"), [Doc. 212]. The Government has responded in opposition to the Motions, [Doc. 217; Doc. 218], and with leave of Court, Defendant filed a reply in support of his Motion for New Trial, [Doc. 221]. For the reasons set forth below, the Motion for Judgment of Acquittal and the Motion for New Trial are **DENIED**.

## BACKGROUND

On March 20, 2024, Defendant Dylan Andrew Miller ("Defendant" or "Mr. Miller") was charged with one count of deprivation of rights under color of law in violation of 18 U.S.C. §§ 242 and 250(a), (b)(1). [Doc. 1]. The Indictment alleged that, while working as a Loveland Police Department ("LPD") Officer, Defendant willfully deprived a minor—referred to in this case using the pseudonym "Olivia," *see* [Doc. 125 at 1]—of her right to bodily integrity by placing his penis in Olivia's mouth without her consent, [Doc. 1 at ¶ 5]. The Indictment alleged the existence of three potential sentencing enhancements,

asserting that Defendant's conduct "included aggravated sexual abuse and kidnapping and involved sexual abuse as defined in 18 U.S.C. § 2242." [*Id.*].

A jury trial commenced on November 17, 2025, [Doc. 163], and on December 2, 2025, a jury found Defendant guilty, [Doc. 197; Doc. 199]. The jury further found that the offense involved sexual abuse and kidnapping. [Doc. 199 at 2]. Mr. Miller now moves for a judgment of acquittal and for a new trial. [Doc. 211; Doc. 212].

## LEGAL STANDARDS

### I. Rule 29

Rule 29 states that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). "[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

A court may enter a judgment of acquittal "only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982). In considering a motion under Rule 29, the Court views the evidence "in the light most favorable to the government[] and without weighing conflicting evidence or considering the credibility of witnesses." *United States v. Fuller*, 751 F.3d 1150, 1153 (10th Cir. 2014) (quotation omitted). The Court's task is to decide whether the evidence, "if believed, would establish each element of the crime." *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001) (quotation omitted). "If the government has met this standard, [the Court] must defer to the jury's verdict." *Id.* "This familiar standard gives full play to the

responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

## II.      Rule 33

Under Rule 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  Unlike a motion under Rule 29, in considering a motion for new trial, the district court considers the credibility of witnesses, weighs the evidence, and does not view the evidence in the light most favorable to the Government.  *United States v. Brown*, 654 F. App'x 896, 908 (10th Cir. 2016).  "A motion for a new trial is not regarded with favor and is only issued with great caution." *United States v. Herrera*, 481 F.3d 1266, 1269–70 (10th Cir. 2007).

## ANALYSIS

## I.      Motion for Judgment of Acquittal

In the Motion for Judgment of Acquittal, Defendant argues that the evidence presented at trial was insufficient to support his conviction.  [Doc. 211 at 3].  To convict Defendant of a willful deprivation of rights under color of law, the Government was required to prove, beyond a reasonable doubt, the following three elements:

|  | |
|---|---|
| *First:* | Defendant was acting under color of law when he committed the act charged in the Indictment; |
| *Second:* | Defendant deprived Olivia of her right to bodily integrity, which includes the right to be free from non-consensual sexual acts and which is a right secured by the Constitution or laws of the United States; and |
| *Third:* | Defendant acted willfully, that is, Defendant acted with a bad purpose, intending to deprive Olivia of that right. |

[Doc. 192 at 20]; *see also United States v. Rodella*, 804 F.3d 1317, 1324 (10th Cir. 2015). Defendant argues that (1) the Government failed to prove that he was the person who assaulted Olivia, [Doc. 211 at 3]; (2) the Government failed to prove that Olivia was deprived of her right to bodily integrity, [*id.* at 5]; and (3) the Government failed to prove that Defendant acted willfully, [*id.* at 8]. He also contends that the Government failed to adduce sufficient evidence to support the jury's findings on both of the sentencing enhancements. [*Id.* at 12–14]. The Court addresses each of these arguments below.

**Identity of Assailant.** First, Defendant argues that the Government failed to prove that he was the person who assaulted Olivia, relying on Olivia's inconsistent physical descriptions of the assailant and his belief that some of Olivia's descriptions do not match his appearance. [*Id.* at 3–4]. He also argues that because the investigating officer, Sergeant Rita Servin, did not turn on her body-worn camera to capture the interview at which Olivia identified Mr. Miller in a photo line-up, there are "many questions about whether Olivia independently chose Miller as the officer who assaulted her." [*Id.* at 4–5]. He also asserts that "no witness present in North Lake Park [on the night of the assault], other than Olivia, testified that Mr. Miller was the officer seen in the park." [*Id.* at 5]. On these bases, Defendant asserts that the Government failed to prove that he was the officer who assaulted Olivia. [*Id.*].

In so arguing, Defendant asks the Court to ignore the applicable legal standards under Rule 29 and invites it to weigh conflicting evidence and determine the credibility of witnesses. Such tasks are well beyond the Court's role, including but not limited to in reviewing a Rule 29 motion, *Fuller*, 751 F.3d at 1153, as weighing the evidence is a task "delegated exclusively to the jury," *United States v. Castorena-Jaime*, 285 F.3d 916, 933

(10th Cir. 2002). This Court's limited role is to determine whether the Government's evidence, if believed, would establish that Mr. Miller was Olivia's assailant. *Vallo*, 238 F.3d at 1247.

Based on the evidence presented at trial, a reasonable jury could conclude beyond a reasonable doubt that Mr. Miller was the person who assaulted Olivia. The Government presented evidence that Olivia was provided a photo line-up of 89 male LPD officers, and when Mr. Miller's picture appeared, Olivia "immediately pointed at the screen" and identified Mr. Miller as the suspect. [Nov. 20 Trial Tr. at 81:18–22, 82:24–83:25].[1] Olivia also made an in-court identification of Mr. Miller as the suspect. [Nov. 19 Trial Tr. at 159:1–16]. This identification was corroborated by other evidence: Olivia testified that she was assaulted at North Lake Park, [*id.* at 143:11–17], and data from Defendant's patrol car mobile data terminal placed him at North Lake Park during the late hours of August 3, 2023 and the early morning hours of August 4, 2023, the time and date of the assault, *see* [Trial Ex. 43; Nov. 21 Trial Tr. at 24:23–26:14].

In addition, Olivia's friend Ethan[2] testified that he and Olivia were encountered by a police officer on August 3, 2024 at North Lake Park, [Nov. 19 Trial Tr. at 49:9–52:14, 66:20–67:9], and the officer told him to leave the park, [*id.* at 52:22–24]. He testified that he recognized the police officer from a prior traffic stop, [*id.* at 49:5–8, 52:15–18], and evidence was presented that Defendant had conducted a traffic stop and pulled over a

---

[1] Although some portions of the trial transcript have been publicly filed on the docket, this Court cites to a nonpublic draft version of the transcript using the convention "Trial Tr." and the transcript's date.

[2] The Court uses the pseudonyms assigned for trial when referencing minor individuals.

car in which Ethan and Olivia were passengers, [*id.* at 45:6–46:16; Trial Ex. 10].[3]  Viewing

all of this evidence in the light most favorable to the Government, a reasonable jury could

find that Mr. Miller was the person who assaulted Olivia in North Lake Park, and

Defendant is not entitled to a judgment of acquittal on this basis.

    ***Deprivation of the Right to Bodily Integrity.***    Defendant next argues that the

Government failed to prove that Olivia was deprived of her right to bodily integrity.  [Doc.

211 at 5].   Again, Defendant focuses on inconsistencies in Olivia's description of the

assault to undermine her credibility, [*id.* at 5–6], but the Court does not weigh evidence

at this stage, *Fuller*, 751 F.3d at 1153.  To the extent Defendant argues that there was

insufficient evidence that oral sex occurred because Olivia had "multiple inconsistent

variations of her story," [Doc. 211 at 6], "[t]he existence of conflicting evidence is common

during criminal trials and a defendant is not entitled to reversal of his conviction as a

result," *United States v. Goodman*, 827 F. App'x 826, 831 (10th Cir. 2020).  Defendant

---

[3] At trial and again in the Motion for Judgment of Acquittal, Defendant focuses on the fact that Olivia originally reported that the assailant was Hispanic, *see* [Nov. 20 Trial Tr. at 11:17–12:4], and he points the finger at a Hispanic LPD officer, *see* [Doc. 211 at 4–5]. This argument, which again asks the Court to ignore Rule 29 standards, is a red herring. As an initial matter, Olivia was cross-examined regarding her first statement identifying her assailant as "possibly Hispanic," [Nov. 20 Trial Tr. at 12:1–2], which allowed the jury to assess her credibility as to the identification of Mr. Miller.  Furthermore, evidence presented at trial showed that, when Sergeant Servin sent a text message to Sergeant Alex Hutchinson containing the file number associated with Mr. Miller's picture used in the photo lineup—which resulted in Olivia "immediately" identifying Mr. Miller as the assailant—Sergeant Hutchinson responded by asking Sergeant Servin to send a photograph of the screen capturing the officer Olivia identified and stating, "Confirming it's Luzon?"  [Trial Ex. 212; Doc. 211-4 at 2].  Sergeant Servin sent back a picture of the screen, and Sergeant Hutchinson responded, "Ok, that's Dylan Miller."  [Doc. 211-4 at 3]. Weighing the evidence in the Government's favor, this evidence shows at best that, before Sergeant Servin confirmed the identity of the suspect, *Sergeant Hutchinson* was confused about which officer Olivia had identified.  That another LPD officer—who has *no* apparent connection to the events leading to this case—happens to be Hispanic does not provide a legitimate basis to attack the jury's verdict.

explored these inconsistencies on cross-examination and emphasized them during closing arguments. *See* [Nov. 19 Trial Tr. at 80:22–81:16; Nov. 21 Trial Tr. at 233:20–234:17; Nov. 24 Trial Tr. at 118:3–18; Nov. 25 Trial Tr. at 224:16–18; Dec. 1 Trial Tr. at 34:6–15, 43:9–15]. The jury was free to resolve any conflicts or inconsistencies in the evidence, and it is not this Court's role to reweigh that evidence. *See United States v. Flynn*, No. 2:16-cr-00056-RJS, 2023 WL 8188593, at *4 (D. Utah Nov. 27, 2023) ("Flynn identified what he thought to be conflicts and inconsistencies in the United States' evidence. He explored those conflicts and inconsistencies through cross-examination. He highlighted them again in his closing argument. However, a reasonable jury could have resolved some or all credibility and reliability issues against Flynn and found the evidence sufficient to convict him beyond a reasonable doubt. That is what the jury did here."), *aff'd*, No. 22-4124, 2025 WL 2406234 (10th Cir. Aug. 20, 2025)

Alternatively, Defendant argues that "there is no evidence that Olivia was in North Lake Park on August 4, 2023" because the Government "failed to extract any data from Olivia's phone to place her in the park that night." [Doc. 211 at 6]. Contrary to Defendant's argument, the Government adduced evidence that Olivia was at North Lake Park the night of the assault. Olivia testified that she was at North Lake Park the night of August 3 to August 4. [Nov. 19 Trial Tr. at 137:17–20]. She also testified that she and Ethan rode their bikes to the park the night of the assault and that she had worked at Culver's the day of the assault. [*Id.* at 116:21–118:8]. Ethan testified that he snuck out of the house on August 3, 2023 and met up with Olivia to ride their bikes to North Lake Park, [*id.* at 49:5–50:1, 66:20–67:9]; *see also* [Trial Exs. 25, 25A, 25B], and evidence was presented that Olivia worked at Culver's on August 3, [Nov. 20 Trial Tr. at 101:5–10]. A reasonable

jury could conclude beyond a reasonable doubt that Olivia was at North Lake Park the night of August 3 into August 4.

Defendant next contends that the Government "failed to prove that any alleged oral sex was non-consensual." [Doc. 211 at 7].  This assertion ignores Olivia's testimony that the contact was not consensual.  *See* [Nov. 19 Trial Tr. at 132:2–3, 134:12–135:3; Nov. 20 Trial Tr. at 49:20–50:13 (Olivia testifying she felt "scared" when Defendant walked her to the picnic table area); *id.* at 50:14–17 ("Q. When you were down at the picnic table area when [Defendant] took his penis out and made you perform oral sex on him, did you feel like you had a choice?  A. Nope."); *id.* at 50:18–20 ("Q. Were you forced to perform oral sex on the defendant that night?  A. Yes.")]; *see also* [Doc. 192 at 22 (jury instructions explaining that "consent that is the product of official intimidation or harassment is not consent at all.  An individual does not consent if she is coerced into complying with a request that she would prefer to refuse"); Doc. 115 at 48–49 (Defendant's proposed final jury instruction with this language)].  There was also evidence that Defendant—a "taller," "broad," uniformed police officer—was alone with Olivia—a then-15-year-old minor—in a park after midnight.  [Nov. 19 Trial Tr. at 101:3–6, 121:7–19, 127:8–17].  A reasonable jury could conclude, based on this evidence, that Olivia was intimidated or coerced into complying and, thus, the sexual contact was not consensual.  Defendant is not entitled to a judgment of acquittal on this basis.

***Willfulness.***  Next, Defendant argues that there was insufficient evidence that he acted willfully.  [Doc. 211 at 8].  To convict Defendant of a § 242 violation, the Government was required to prove that Defendant acted willfully, i.e., with the "specific intent . . . to deprive a person of a right which has been made specific either by the express terms of

the Constitution or laws of the United States or by decisions interpreting them." *Screws v. United States*, 325 U.S. 91, 104 (1945) (plurality opinion); *see also* [Doc. 192 at 24 ("A defendant acts willfully if he acts voluntarily and intentionally, with the specific intent to do something the law forbids.  To find that the Defendant acted willfully, . . . you must find that Defendant had a specific intent to deprive Olivia of a right protected by the Constitution or federal law.")].

Many of Defendant's arguments with respect to willfulness ask the Court to weigh conflicting evidence or view the evidence in the light most favorable to him, which the Court will not do.  Setting those arguments aside, Defendant argues that willfulness cannot be proved by his failure to turn on his body-worn camera when he encountered Olivia.  *See* [Doc. 211 at 8–9].  The Court disagrees.

"Willfulness can be inferred from 'plainly' wrongful conduct, . . . inconsistency between actions and training, . . . and efforts to prevent detection of wrongful behavior." *Brown*, 654 F. App'x at 910 (first citing *Screws*, 325 U.S. at 106; then citing *Rodella*, 804 F.3d at 1338; and then citing *United States v. House*, 684 F.3d at 1173, 1202 (11th Cir. 2012)).  Evidence presented at trial demonstrated that Mr. Miller failed to turn on his body-worn camera during his encounter with Olivia.  *See* [Trial Ex. 41; Nov. 20 Trial Tr. at 256:18–257:6; Nov. 21 Trial Tr. at 29:17–34:4].  There was also evidence that Mr. Miller had entirely taken his body-worn camera off.  [Nov. 19 Trial Tr. at 128:8–17].  This evidence provided a basis for a reasonable jury to conclude that Mr. Miller attempted to prevent detection of wrongful behavior.  And because LPD policy requires officers to "wear and activate the BWC equipment to record contacts with the public . . . during any interaction with the public initiated by the officer," [Trial Ex. 39 at 3–4 (emphasis omitted);

Nov. 20 Trial Tr. at 244:17–246:4], a reasonable jury could infer willfulness based on the inconsistency between the LPD policy and Mr. Miller's actions, *Brown*, 654 F. App'x at 910.  And finally, a reasonable jury could conclude that Defendant engaged in "plainly" wrongful conduct by forcing a 15-year-old to perform oral sex on him.  *Id.*  For all of these reasons, there was sufficient evidence for the jury to find beyond a reasonable doubt that Defendant acted willfully, and the Court need not consider Defendant's alternative arguments attacking other pieces of evidence.

***Kidnapping or Sexual Abuse.***  Finally, Defendant argues that the Government failed to prove that the offense involved either kidnapping or sexual abuse.  [Doc. 211 at 13–14].  With respect to the sexual abuse enhancement, the jury was instructed as follows:

> A defendant commits "sexual abuse" if he knowingly either (1) causes another person to engage in a sexual act by threatening or placing that other person in fear, or (2) engages in a sexual act with another person without that other person's consent, to include doing so through coercion.
>
> For the first prong of this element, the Government need not show that the defendant placed the other person in fear of death, serious bodily injury, or kidnapping; instead, the Government only needs to prove that the defendant put the other person— here, Olivia—in fear.
>
> As you have already been instructed, the term "sexual act" includes contact between the mouth and the penis.
>
> The term "coercion" encompasses both physical and nonphysical coercion.

[Doc. 192 at 26–27].  As for kidnapping, the instructions stated:

> You may find the offense involved kidnapping if you find that Olivia was forcibly held, detained, or carried away against her will for a reason unrelated to a legitimate law enforcement objective.  Law enforcement officers may seize individuals and hold them against their will when making an arrest based upon probable cause that the person broke the law.  Once arrested, an individual may be transported to a jail, police station, courthouse, or similar facility to be booked and to await a judicial

determination as to whether they should be detained for reasons of public safety.

A law enforcement officer may not, however, detain or physically isolate someone for a purpose that, viewed objectively from the perspective of a reasonable officer, is unrelated to a legitimate law enforcement objective, such as for personal pecuniary gain, sexual gratification, or to retaliate or extract vengeance.

[*Id.* at 27].

Mr. Miller contends that the Government failed to prove that the offense involved sexual abuse "[f]or the reasons stated in Section I.B. of th[e] Motion for Judgment of Acquittal," i.e., for the same reasons Defendant argued that there was insufficient evidence that Olivia was deprived of her right to bodily autonomy. *See* [Doc. 211 at 14; *id.* at 5–8]. For the reasons discussed above, the Court finds that there was sufficient evidence for the jury to conclude that Defendant deprived Olivia of her constitutional right to bodily autonomy by forcing her to perform oral sex on him without her consent. There was thus a reasonable basis for the jury to conclude that Defendant engaged in a sexual act with Olivia without Olivia's consent and a reasonable basis for the jury to find that the offense involved sexual abuse.

As for kidnapping, Defendant argues that the Government did not prove this enhancement because it "failed to show any evidence of force, physical or otherwise." [Doc. 211 at 13]. He asserts that because Olivia denied at trial that Mr. Miller "ever threatened her, dragged her, or held a gun to her head," and because she acknowledged that she "could have gone home or called for help, but she did not," "[t]hese facts confirm that Olivia was never forcibly held, detained, or carried away." [*Id.*].

The Court is unpersuaded by Defendant's argument. "The act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or

11

mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim." *Chatwin v. United States*, 326 U.S. 455, 460 (1946). Here, the Court concludes that there was sufficient evidence from which a reasonable jury could find, beyond a reasonable doubt, that the offense involved kidnapping. Specifically, Olivia testified that Mr. Miller approached her and Ethan in the park and told Ethan to leave, which left him alone with Olivia. [Nov. 19 Trial Tr. at 121:7–19]. Olivia testified that Mr. Miller was in uniform, was "[m]uch taller" than her and had a broad build. [*Id.* at 127:8–17]. Mr. Miller suggested to Olivia that she might get in trouble for being out past curfew and asked how they could "solve it," stating that the solution "ha[d] to be something physical." [*Id.* at 122:14–123:1, 123:10–12]. He then told Olivia that they "needed to walk away from the camera," [*id.* at 128:20], and Olivia testified that she did not feel like she could disobey Defendant because he was a member of law enforcement, [*id.* at 129:6–15]; *see also* [Nov. 20 Trial Tr. at 49:20–25 (Olivia "felt like [she] didn't have a choice" but to go on the walk)]. When they were walking to the beach, Mr. Miller took Olivia's cell phone. [Nov. 19 Trial Tr. at 135:9–18]. She was scared. [Nov. 20 Trial Tr. at 50:6–10].[4]

Olivia also testified that, during the assault, Defendant "had his hand on top of [her] head and he was guiding [her] head." [Nov. 19 Trial Tr.at 132:15–24]. She testified that she did not feel like she could leave or had a choice to leave because Defendant "had a

---

[4] To the extent Defendant's argument could be construed as an assertion that physical force is required, this assertion is inconsistent with this Court's jury instructions on kidnapping—which mirrored Defendant's proposed instruction. *Compare* [Doc. 115 at 63], *with* [Doc. 192 at 27]. Defendant raises no argument that the jury instruction was erroneous, *see* [Doc. 211; Doc. 212]. Nor does Defendant cite any legal authority establishing that evidence of *physical* force was required for the jury to find that the offense involved kidnapping. *See* [Doc. 211 at 13–14]. The Court thus declines to require, post-trial and for the first time, that "kidnapping" under § 242 requires restraint through *physical* force.

higher power than [her], and [she] felt like if [she] left, he could turn it around and get [her]
in trouble."  [*Id.* at 134:12–135:3]; *see also* [Nov. 20 Trial Tr. at 50:21–23].

Based on all of this evidence, construed in the Government's favor, a reasonable
jury could conclude beyond a reasonable doubt that Defendant forcibly detained Olivia at
the time of the offense such that the offense involved kidnapping.  And because there is
no basis to vacate the jury's verdict, the Motion for Judgment of Acquittal is **DENIED**.

## II.    Motion for New Trial

In the Motion for New Trial, Defendant argues that the Government "blatantly
delayed disclosure of several pieces of material exculpatory and impeachment evidence"
before and during trial.  [Doc. 212 at 1].  He asserts that the Government's delayed
disclosures violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and
*Giglio v. United States*, 405 U.S. 150 (1972), and a new trial is warranted as a result, *see*
[Doc. 212].[5]

In *Brady v. Maryland*, the Supreme Court recognized that "the suppression by the
prosecution of evidence favorable to an accused upon request violates due process
where the evidence is material either to guilt or to punishment, irrespective of the good
faith or bad faith of the prosecution."  373 U.S. at 87.  The duty to disclose exculpatory
materials "extends to prosecutors, police, and other government investigators."  *United
States v. Velarde*, 485 F.3d 553, 559 (10th Cir. 2007).  "Impeachment evidence . . . falls

---

[5] Defendant suggests, but does not substantively argue, that the jury's verdict was against
the weight of the evidence.  *See, e.g.*, [Doc. 212 at 2, 9, 15].  Because Defendant does
not develop this argument, the Court does not consider it.  *See United States v. Cooper*,
654 F.3d 1104, 1128 (10th Cir. 2011) (deeming "inadequately briefed" arguments waived
(quotation omitted)).

within the *Brady* rule." *United States v. Young*, 45 F.3d 1405, 1408 (10th Cir. 1995) (citing *Giglio*, 405 U.S. at 154).

A defendant moving for a new trial based on alleged *Brady* violations must demonstrate that "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999). Evidence is "material" "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Young*, 45 F.3d at 1408 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *Bagley*, 473 U.S. at 682. "To the extent *Brady* applies where an allegation is made that the government's belated disclosure of material during the trial resulted in prejudice to the defense, the materiality inquiry focuses on whether earlier disclosure would have created a reasonable doubt of guilt." *Young*, 45 F.3d at 1408 (footnote omitted). "[A] defendant establishes a *Brady* violation 'by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Fontenot v. Crow*, 4 F.4th 982, 1080 (10th Cir. 2021) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

Mr. Miller identifies three purported *Brady* violations: (1) the Government's failure to timely turn over information obtained during trial preparation sessions held with Olivia and Ashley, [Doc. 212 at 7–10]; (2) the Government's failure to timely turn over a text message thread between Government attorneys and Sergeant Servin, [*id.* at 10]; and (3) the Government's failure to timely disclose an email thread between FBI Special Agent

14

Ryan Hammer and FBI Special Agent Ben Harris discussing Special Agent Hammer's location data analyses, [*id.* at 10–15]. The Court addresses each below.

### A.      Reports from Trial Preparation Sessions

On November 15, 2025, the Saturday before trial began, Defendant moved to dismiss the Indictment on the basis that the Government violated its *Brady* obligations by failing to turn over reports from Olivia's trial preparation sessions. *See* [Doc. 148]. Broadly speaking, he argued that although the Government had been interviewing witnesses over the last several weeks, the Government had failed to timely produce its new reports related to those interviews. [*Id.* at 2–4]. The Government responded the following evening. [Doc. 151]. Around the same time, the Government produced to defense counsel "a supplemental discovery letter [that] reflect[ed] the information that [would] be included in the report that [was] anticipated to be approved by the Larimer County Sheriff's Office" the morning of November 17, 2025. [Doc. 212-1 at 1].

On November 17, 2025, the Court heard argument on Defendant's motion before jury selection. *See* [Nov. 17 Trial Tr. at 17:25–47:24]. Defendant argued, among other things, that the discovery letter produced the night before revealed that during the trial preparation sessions, Olivia had provided inconsistent or new information about the alleged assault and other encounters with Mr. Miller, which Defendant argued was exculpatory *Brady* and *Giglio* material. [*Id.* at 29:14–30:16]. During a break in the proceedings, the Government produced a report from the Larimer County Sheriff's Office regarding four trial preparation sessions with Olivia. [*Id.* at 50:2–5; Doc. 212-2 at 2–4]. The Court ultimately denied Defendant's motion, concluding that that any suppressed evidence of any inconsistencies in Olivia's description of the assault was not material for

purposes of *Brady* because there was already ample evidence of inconsistent statements from Olivia in the record. [Nov. 17 Trial Tr. at 55:16–56:13]. However, the Court delayed opening statements until the morning of November 18, 2025 "to allow for adequate preparation of this additional and new information." [*Id.* at 56:13–17].[6]

Defendant orally renewed his motion to dismiss on November 20, 2025, [Nov. 20 Trial Tr. at 264:1–3, 269:24–270:1], and filed a supplemental motion to dismiss that night, *see* [Doc. 161]; *see also* [Doc. 162 (the Government's response)]. The oral motion focused on statements made by Olivia about her encounter with Defendant. *See* [Nov. 20 Trial Tr. at 264:1–10, 264:17–265:12]. The written motion also asserted that, in a new report provided to the defense on November 17, 2025, the Government disclosed for the first time that "[Ashley] and Olivia smoked marijuana on the night they encountered Mr. Miller in his personal vehicle while they were driving around with Ethan." [Doc. 161 at 2]. Defendant argued that these late disclosures violated the Government's obligations under *Brady* and *Giglio*. [*Id.* at 3].

The Court denied the renewed and supplemental motion the morning of November 21. With respect to Olivia's inconsistent statements, the Court first concluded that it was unclear whether this information had actually been suppressed by the Government. [Nov. 21 Trial Tr. at 4:7–11]. But even assuming it was suppressed, the Court found that any suppressed evidence was not material under *Brady* because it amounted to cumulative impeachment evidence on an already compromised witness. *See* [*id.* at 4:11–12, 5:17–7:19]. Specifically, the Court noted that defense counsel had already cross-examined

---

[6] Because jury selection was not completed until 6:00 p.m. on Tuesday, November 18, opening statements began on Wednesday, November 19. [Nov. 18 Trial Tr. at 245:6–16; Nov. 19 Trial Tr. at 10:17–18].

Olivia in multiple instances about the details of the alleged assault and any purported inconsistent or incomplete statements.  [*Id.* at 6:13–25].  The Court concluded that any additional impeachment evidence about details related to Olivia's encounter with Defendant on July 27, 2023 would be incremental and not material.  [*Id.* at 7:12–19].  As for Ashley's statement about smoking marijuana, the Court again concluded that it was not clear that there was any suppression of evidence because the subject interview was conducted on Friday, November 14, the business day before trial commenced, and the Government turned over the interview report when it received it on November 17, 2023.  [*Id.* at 7:19–8:3].  The Court also noted that the information was disclosed two days before the defense cross-examined Olivia and had not yet called Ashley as a witness, and found that because Defendant had not addressed prejudice at all in his supplemental motion, Defendant was not materially prejudiced by any belated disclosure.  [*Id.* at 8:3–9:2]; *see also United States v. Burke*, 571 F.3d 1048, 1056 (10th Cir. 2009) ("To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."); *United States v. Warhop*, 732 F.2d 775, 777 (10th Cir. 1984) ("As long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence, Due Process is satisfied." (cleaned up)).

Defendant argues in his Motion for New Trial that the additional impeachment evidence about Olivia's inconsistencies was not cumulative.  [Doc. 212 at 7–8].  He asserts that "successfully impeaching a witness requires demonstrating falsity, contradictions, unbelievable circumstances, and the like," and that the evidence at issue "demonstrated new, additional instances in which Olivia's credibility was factually

undermined and/or clearly inconsistent to prior versions of her story.  [*Id.* at 7].  As for Ashley's new statement, he asserts that the belated disclosure of this information—made on the first day of trial—precluded his ability to use the information to effectively cross-examine Olivia and Ashley because "defense counsel's attention had to be elsewhere." [*Id.* at 9].  He argues that the Court should find that the Government violated its *Brady* obligations, vacate the verdict, and order a new trial.  [*Id.*].

The Government responds that (1) it did not suppress evidence because it "disclosed witness interview reports to the Defendant no later than one day after counsel for the Government received the final reports from the agents," and (2) any suppressed evidence is not material and would not create a reasonable probability that Defendant would have been acquitted at trial.  [Doc. 218 at 5–7].  With respect to Olivia's and Ashley's marijuana use, the Government notes that Defendant "had the opportunity to cross-examine both Olivia and Ashley with the information contained in the reports" and that Defendant does not explain "*how* an earlier disclosure" would have led to a different result.  [*Id.* at 7].

The Court respectfully agrees with the Government that Defendant has not demonstrated that "earlier disclosure would have created a reasonable doubt of guilt." *Young*, 45 F.3d at 1408.  In assessing materiality, courts "review the cumulative impact of the withheld evidence, its utility to the defense as well as its potentially damaging impact on the prosecution's case."  *Fontenot*, 4 F.4th at 1080 (quotation omitted). Relevant here, if evidence only "insignificantly impacts the degree of impeachment, it generally will not be sufficient to meet the materiality standard." *United States v. Cooper*, 654 F.3d 1104, 1120 (10th Cir. 2011) (cleaned up).  For example, if a witness's credibility

"has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim." *Id.* (quoting *Nuckols v. Gibson*, 233 F.3d 1261, 1267 n.8 (10th Cir. 2000)).

At trial, the defense attacked Olivia's credibility by questioning her about (1) outside influences in the reporting process and how those influences affected her recollection of the events, [Nov. 19 Trial Tr. at 203:2–16, 204:25–205:2, 206:4–6, 214:25–215:3, 216:1–16, 221:14–21, 233:8–11, 255:20–256:8, 257:18–24, 259:5–16; Nov. 20 Trial Tr. at 8:9–9:4, 37:15–20, 39:15–19]; (2) Olivia's withholding of information, [Nov. 19 Trial Tr. at 209:5–22, 256:6–10, 265:11–12, 266:17–21]; (3) Olivia's memory or inability to remember, [*id.* at 213:5–15, 214:5–22, 216:17–217:13, 219:22–220:9, 220:10–19]; (4) inconsistencies in Olivia's reports or descriptions of the assault, [*id.* at 213:16–23, 236:5–11, 236:21–24, 238:10–16, 262:7–9, 266:11–21]; (5) new information Olivia had recently provided about the assault, [*id.* at 218:10–219:13, 219:14–21, 220:20–23, 231:25–232:8; Nov. 20 Trial Tr. at 15:12–16:6]; and (6) potential motives for lying, [Nov. 19 Trial Tr. at 241:8–15, 243:21–244:3, 246:18–25, 249:6–19, 255:20–256:8, 257:18–24, 258:13–259:4; Nov. 20 Trial Tr. at 22:5–12]. And with respect to inconsistencies in Olivia's recollection specifically, the defense asked Olivia about (1) inconsistencies in the reported date of the assault, [Nov. 19 Trial Tr. at 213:16–214:4; Nov. 20 Trial Tr. at 7:20–8:11, 9:20–10:15, 11:5–12]; (2) whether Olivia inconsistently said that her walk with Defendant lasted an hour, or whether she said that they were together for about an hour in total, [Nov. 19 Trial Tr. at 238:5–19, 238:25–239:2]; (3) inconsistencies between her original physical description of the assailant and later descriptions, [Nov. 20 Trial Tr. at

11:13–14:21]; (4) potential inconsistencies between her description of the assault itself, [*id.* at 16:13–16, 17:11–19]; (5) inconsistencies in Olivia's description about whether she walked home or rode her bike home after the assault, [*id.* at 17:20–19:18]; (6) an inconsistency between Olivia's statement that she told her grandparents about the assault and her text message to a friend that someone else told her grandparents, [*id.* at 28:21–23]; (7) an inconsistency as to whether she had ever seen Mr. Miller aside from the July 27 traffic stop and the night of the assault, [*id.* at 40:13–43:17]; (8) an inconsistency about who she talked to after she got home on August 4, 2023, [*id.* at 43:20–44:16]; (9) an inconsistency as to how many friends she told about the assault, [*id.* at 44:17–45:16, 45:23–46:8]; and (10) whether she had ever lied to law enforcement during the investigation, [*id.* at 47:22–48:8].

In light of all of this impeachment evidence, the additional inconsistency evidence highlighted by Defendant only "insignificantly impact[ed] the degree of impeachment." *Cooper*, 654 F.3d at 1120. Indeed, Olivia's credibility was already substantially called into question "in the same respects by other evidence"—namely, inconsistency evidence that could suggest a lack of truthfulness. *Id.* (quotation omitted). The additional evidence was, therefore, not material for purposes of Brady. *See id.*; *see also United States v. Dermen*, 143 F.4th 1148, 1202 (10th Cir. 2025) ("[I]n light of the extensive impeachment that Mr. Kazi was otherwise subjected to, we have difficulty discerning how additional lines of impeachment would have significantly altered the jury's overall perception of Mr. Kazi's credibility.").

The Court is similarly unpersuaded by Defendant's arguments with respect to Ashley's statement. Defendant cross-examined both Olivia and Ashley about their

20

marijuana use the night they encountered Mr. Miller after the assault. *See* [Nov. 19 Trial Tr. at 263:12–16; Nov. 21 Trial Tr. at 238:11–239:16].[7] Although Defendant argues that the disclosure on the first day of trial "prejudiced the defense's ability to effectively use the disclosure during cross-examination," he does not explain why disclosure on Friday, November 14 would have changed his cross-examination strategy or made it more effective. [Doc. 212 at 9].[8] In other words, he does not demonstrate that if the information had been disclosed on November 14, there is a "reasonable probability that . . . the result of the proceeding would have been different" or that "earlier disclosure would have created a reasonable doubt of guilt." *Young*, 45 F.3d at 1408. For all of these reasons, the Court finds that there was no material *Brady* violation here.[9]

---

[7] Ashley's cross-examination referred to this encounter as occurring on September 15, 2023, as that was the date that Ashley stated she believed the encounter occurred. *See* [Nov. 21 Trial Tr. at 238:11–14].

[8] Defendant also argues that the disclosure on Monday, November 17, instead of Friday, November 14, "deprived the defense of the opportunity to investigate the marijuana usage further *before* trial began." [Doc. 212 at 9]. But this assertion is not accompanied by any explanation as to how the defense would have "investigated" the marijuana usage the weekend before trial.

[9] In passing within a footnote, Defendant suggests that the Government also failed to turn over exculpatory information related to another witness, Nathan. Specifically, Defendant represents that counsel

> was also recently made aware of a trial prep session the government had with Nathan in which he said he no longer believed Olivia's allegations of assault. This change in his testimony was never provided to the defense. This evidence is impeachment and exculpatory evidence as it challenges Olivia's credibility and could have been admissible had the government opened the door to it. The prejudice resulting from the government's failure to disclose Nathan's trial prep report is exacerbated by his thumbs-up gesture to Harris at the end of his testimony.

[Doc. 212 at 8 n.3]. The Government vigorously denies this contention and challenges its admissibility at trial. [Doc. 218 at 3 n.1]. The Court, however, need not resolve this dispute because this argument is unsupported by any evidence or legal authority. *See* [Doc. 212 at 8 n.3]; *United States v. Martinez*, 518 F.3d 763, 768 (10th Cir. 2008) ("But this contention appears only in a fleeting sentence at the conclusion of Mr. Martinez's

### B.    Sergeant Servin Text Message

Next, Defendant focuses on a text message Sergeant Servin sent to prosecutors on Monday, November 17.  *See* [Doc. 212 at 10].[10]  The text message exchange was as follows:

> Government counsel:  Rita is there a LCSO policy that governs you not needing to use BWC during trial prep meetings?
>
> Sergeant Servin:  Not directly

[Trial Ex. 211; Doc. 212 at 10].  This text message was provided to defense counsel on November 20, 2025.  [Doc. 212 at 10].  Defendant argues that "the unjustifiably late disclosure prejudiced the defense's ability to adequately investigate the LCSO body cam policy in order to effectively cross-examine Servin about it, and about what 'not directly' means."  [*Id.*].  He argues that if the defense had the text message when Sergeant Servin sent it to prosecutors, "the evidence could have been used more effectively."  [*Id.*].  He does not explain how the text message would have been used differently or more effectively with earlier disclosure.  [*Id.*].  The Government responds that the text message was not *Brady* or *Giglio* material, so disclosure under those doctrines was never required.

---

opening brief, supported by no analysis or citation; without any such development, our precedent instructs us to deem the point waived and leave any such challenge for another day.").

[10] Defendant correctly states that Sergeant Servin testified on November 20, 2025 that "she gave the text to the prosecutors 'several days ago.'"  [Doc. 212 at 10].  The Court observes that the text message was sent to prosecutors (i.e., the text message was a direct communication to prosecutors) on Monday, November 17—the first day of trial.  [Nov. 20 Trial Tr. at 179:19–22 (Sergeant Servin confirming that defense counsel was "showing [her] a text message from this Monday"); *id.* at 180:2–4 (Sergeant Servin confirming that the message was a "text message with [her] and the prosecutors")].  At trial, defense counsel confirmed that she received a copy of the text message on Thursday, November 20.  [*Id.* at 180:2].

22

[Doc. 218 at 9]. Rather, the Government says that it disclosed the text message on November 19 as Jencks material. [*Id.* at 8].[11]

Mr. Miller raised this same argument in his supplemental motion to dismiss, arguing that the Government violated *Brady* and *Giglio* through its delayed disclosure of the text message. [Doc. 161 at 3]. The Court rejected this argument, finding that the text message "does not appear to be exculpatory nor does it appear to be inconsistent with Sergeant Servin's testimony." [Nov. 21 Trial Tr. at 9:3–8]. The Court further concluded that "given that this evidence was disclosed before Sergeant Servin testified and defense counsel was able to review and use it extensively during cross-examination," the evidence "was not impermissibly suppressed or delayed." [*Id.* at 9:14–19]. And finally, the Court explained that even if it assumed that there was a delay in production, Defendant had not demonstrated that any delay was materially prejudicial. [*Id.* at 10:6–9].

The Court reaches the same conclusion here. The text message between prosecutors and Sergeant Servin does not constitute *Brady* or *Giglio* material because it is not inconsistent with Sergeant Servin's testimony and is, therefore, not impeachment evidence. Specifically, Sergeant Servin stated the following on cross-examination:

Q. [S]peaking of body-worn cameras, Larimer County Sheriff's Office has a policy regarding body-worn cameras, correct?

A. Correct.

---

[11] Under the Jencks Act, "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . .of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b); *see also United States v. Lujan*, 530 F. Supp. 2d 1224, 1232 (D.N.M. 2008) ("The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified." (quoting 18 U.S.C. §§ 3500(a), (b)).

23

. . .

Q.  Looking under the paragraph stating "User Requirements Specific to Body-Worn Camera," it states, "in general, it is expected that any time an employee contacts a member of the public in person, in an enforcement or investigative capacity, their body-worn camera is activated"?

A.  Correct.

Q.  And what that is saying, similar to the Loveland Police Department and many police departments these days, is that you are expected to have your body-worn camera on and recording when you are doing an investigation?

A.  Correct.

Q.  And doing an investigation includes taking statements of witnesses, correct?

A.  Correct.

. . .

Q.  Now, in those last four trial prep sessions recently with Olivia, because of the nature of what you are talking about, you and everyone in the room, you should have had your body-worn camera recording all of those trial prep sessions?

A.  No, ma'am.

Q.  You are saying that this policy did not require you, as a Loveland, Colorado Sheriff Officer, to record [Olivia's] new and different information during those four trial prep sessions?

A.  That's correct.

Q.  Can I see Exhibit 211 please, just for the witness and the Court? Sergeant Servin, I am showing you a text message from this Monday?

A.  Yes.

Q.  And you recognize that, right?

A.  Yes.

. . .

24

Q. You just told us here, under the policy that we were just looking at, that you are not required to wear your body cam during the prep sessions you had with Olivia?

A. Correct.

Q. This text message contradicts what you just told us because you are telling the prosecutors "not directly"?

A. I would say "not directly" and "no" is the same answer.

Q. Indirectly?

A. Not directly or indirectly, so, no, it does not violate our policy.

Q. Hold on a second, because you said not directly, not indirectly, so that means it is a gray area; right?

A. Yes, it does not violate our policy.

[Nov. 20 Trial Tr. at 177:8–11, 178:7–22, 179:8–24, 181:24–182:11]. The Court does not perceive an inconsistency between (1) Sergeant Servin answering "[n]ot directly" when asked if there was a policy "govern[ing] [her] not needing to use BWC during trial prep meetings" and (2) Sergeant Servin explaining on cross-examination that while the Larimer County Sheriff's Office requires employees to wear body-worn cameras during investigations, it did not require her to wear a body-worn camera during trial-prep sessions. The second requirement for a *Brady* violation has thus not been established.

Furthermore, Defendant has not established that the evidence, if exculpatory, was material. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." *Burke*, 571 F.3d at 1056 . Although he asserts that if his attorneys received the text message earlier, "the evidence could have been used more effectively," Defendant does not explain *how* the evidence could or would have been used differently or how earlier disclosure

would have created a reasonable doubt of guilt.  [Doc. 212 at 10].  Defense counsel questioned Sergeant Servin about the lack of body-worn camera footage from the trial prep sessions for several minutes, *see* [Nov. 20 Trial Tr. at 178:7–183:3], and he does not identify any specific additional lines of questioning that he would have pursued if the text message had been disclosed earlier, see [Doc. 212].  The Court finds no *Brady* violation here.

### C.    Special Agent Hammer

On Friday, November 21, 2025, the Government called Special Agent Hammer to testify as an expert about historical cell site analysis.  [Nov. 21 Trial Tr. at 124:18–20, 125:14].  Among other topics, Special Agent Hammer testified that he could not recall whether he did any location data analyses for data captured on August 13, 2023 or the afternoon of August 14, 2023.  [*Id.* at 206:11–207:15].  He also confirmed that it was "correct" that he did not perform any analysis of data from the evening of August 13, 2023. [*Id.* at 206:19–23].  Then, on Sunday, November 23, 2025, Government counsel produced to defense counsel "an email that [the Government] believe[d] [would] be Jencks material" relating to the testimony of FBI Special Agent Ben Harris.[12]  [Doc. 212-8 at 1, 3–5].  In the email thread, Special Agent Harris asked Special Agent Hammer to look at location data from Mr. Miller's personal and work phones for the following dates and times:  "8/13 – Evening (8pm – 3am)"; "8/14 – Afternoon (2pm – 8pm[)]"; and "9/15 – Evening (8pm – 3am)."  [*Id.* at 3–4].

---

[12] Special Agent Harris was the Government's advisory witness and was therefore present at counsel table throughout trial.  *See* [Doc. 125 at 3].

On November 24, Defendant raised another argument under *Brady* and *Giglio* in open court. He argued that the email thread showed, contrary to Special Agent Hammer's testimony, that he did review location data from August 13, 2023 and August 14, 2023, such that the email was impeachment evidence and the Government was required to disclose the email under *Giglio*. [Nov. 24 Trial Tr. at 13:11–14:21, 15:23–16:18]. He also argued that it called certain aspects of Ethan's, Olivia's, and Ashley's testimony into question. [*Id.* at 15:3–18, 17:10–13]. After taking the matter under advisement, the Court denied Defendant's oral motion to dismiss, finding that the email could not reasonably deemed *Giglio* impeachment material until Special Agent Hammer testified on cross-examination that he could not recall if he did an analysis of data from August 13 or August 14, 2023. [*Id.* at 112:16–113:2]. The Court made clear that it was "not persuaded that any undue prejudice" had resulted, but ordered the Government to make Special Agent Hammer available for re-cross-examination. [*Id.* at 113:3–25]; *see also* [*id.* at 111:3–10].

Defendant now argues that the failure to provide the email thread to defense counsel violated the Government's obligations under *Brady* and *Giglio* "because the email would have impeached Hammer and allowed defense counsel to elicit that an analysis of August 13, 2023 was in fact done but turned up nothing useful for the government, thus rendering it exculpatory." [Doc. 212 at 12]. He also argues that because of the belated disclosure, he could not address this exculpatory information in his opening statement. [*Id.*]. He also argues that the re-cross-examination of Special Agent Hammer did not cure the prejudicial effect of the violation because Special Agent Hammer "had time to prepare

27

for the limited re-cross," and he would not have had this opportunity if the email had been disclosed prior to the original cross-examination.  [*Id.* at 14].[13]

The Government responds that the email is not exculpatory; rather, "[t]he arguably exculpatory information is contained in the phone records themselves," which the Government produced to Defendant in 2024.  [Doc. 218 at 13].  It contends that Defendant could have initially cross-examined Special Agent Hammer with respect to those specific dates, but he chose not to do so.  [*Id.*].  In his reply brief, Defendant acknowledges that the phone records are exculpatory, but argues that the email thread "is also exculpatory" because Special Agent Harris's "explicit request that Hammer analyze those dates" shows that "Hammer did analyze those dates and, given the exclusion of these dates from his report, found no corroborating evidence."  [Doc. 221 at 8].

The Court agrees with the Government in part.  The Government's Rule 16 disclosure informed Defendant that Special Agent Hammer had formed opinions based on "his . . . analysis of the location data for two cell phones" and "his . . . analysis of the location data for" a 2020 Ford Expedition.  [Doc. 67-1 at 10–11].  The disclosure stated that Special Agent Hammer "examined records associated with" the cell phones and vehicle.  [*Id.* at 12].  Then, in his original testimony, Special Agent Harris testified that he

---

[13] Defendant also cursorily argues that "Hammer's incorrect testimony was also a *Napue* violation as false testimony that the government failed to correct."  [Doc. 212 at 12].  In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court "held that the Due Process Clause would be violated if the prosecutor knowingly failed to correct perjured testimony in its case, even when the evidence went only to the credibility of the witness," *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015).  "A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material."  *Id.*  Defendant does not reference this standard or otherwise raise any meaningful argument under *Napue*, and the Court finds that any such argument has been waived.  *Cooper*, 654 F.3d at 1128.

reviewed Exhibits 34 to 37 in conjunction with creating his report.  [Nov. 21 Trial Tr. at 152:6–10].  Defendant does not dispute that these exhibits contained data for August 13, August 14, or September 15.  *See* [Doc. 221]; *see also* [Trial Exs. 34–37].  The fact that Defendant already had this evidence in his possession weighs against finding a *Brady* violation here, as it suggests that any suppressed evidence was not material.  *See Quintanilla*, 193 F.3d at 1149 ("[A] defendant's independent awareness of the exculpatory evidence is critical in determining whether a *Brady* violation has occurred.  If a defendant already has a particular piece of evidence, the prosecution's disclosure of that evidence is considered cumulative, rendering the suppressed evidence immaterial."); *Fontenot*, 4 F.4th at 1066 (noting that a defendant's knowledge of evidence "implicates the element of prejudice, or materiality").  Indeed, Defendant could have cross-examined—and did cross-examine—Special Agent Harris about his analysis of location data from two of those dates:

> Q.  Can we please turn to Exhibit 32S?  Thank you.  Now, Special Agent Hammer, with regards to the timing advance summary the document you created, this is again for August 14, 2023, within relation to Mr. Miller's cellphone; is that correct, sir?
>
> A.  That's correct.
>
> Q.  Okay.  And I am looking at 12:46 to 1:00 a.m.  So was it Special Agent Harris that provided you the dates and time for you to conduct the analysis on this document?
>
> A.  Yes, if I recall this date and general time period was provided as a timeframe of interest.
>
> Q.  He did not tell you to look at dates and times at 11:30 [to] 11:30 p.m. on August 14, 2023—he didn't tell you to look at that?
>
> A.  I am sorry, what time period?

Q.  11:30 p.m. for Mr. Miller's cellphone on August 14, 2023.  He didn't tell you to look at that time?

A.  I can't recall.

Q.  Did he tell you to look at any time before 12:46 a.m., actually I will [say it] differently, strike that bad question.  August 13, that is what I want to ask about.  August 13 at 11:30 p.m.  Did Special Agent Harris give you that time period to look at Mr. Miller's timing advance bands information from the AT&T records?

A.  Again, I can't recall the specific time period that was provided.

Q.  But based on the fact that we have your total report, and reviewing it, you have done no analysis regarding . . . Mr. Miller for the evening of August 13, 2023, isn't that true?

A.  That's correct.

. . .

Q.  Also, did Special Agent Harris ask or request that you look to see where his whereabouts were the afternoon of August 14, 2023, did he ask you to do that?

A.  Again, I can't recall the specific time period, but if it wasn't mapped then likely not.  But again I can't recall definitely.

Q.  So really as I understand it, the best information you had to conduct other than the AT&T records, I understand that and Verizon records and so forth but a lot of the information that you received to give you direction on where to go with your analysis came from Ben Harris; is that correct?

A.  Correct, which is generally when in conducting this analysis where provided details pertinent investigative details in order to conduct an analysis.

[Nov. 21 Trial Tr. at 205:18–207:24].[14]

---

[14] Defense counsel did not ask Special Agent Harris during the original cross-examination whether he analyzed data for September 15, 2023.  *See* [Nov. 21 Trial Tr. at 195:25–208:4].

30

As this Court previously ruled, the email could not reasonably be deemed *Giglio* material until Special Agent Hammer testified that (1) he could not recall whether Special Agent Harris asked him about specific dates, and/or (2) he did not do any analysis for the evening of August 13, 2023. *See* [Nov. 24 Trial Tr. at 112:11–113:2]. If defense counsel had had possession of the email at this point during cross-examination, counsel could have potentially used the email thread to attempt to impeach Special Agent Hammer. But up until this point, the email thread was not exculpatory, and *Brady* and *Giglio* did not require its disclosure. Therefore, Defendant's arguments about his opening statement are not persuasive.

Even with the Government's belated disclosure of the email—turning it over to defense counsel on Sunday, November 23—the Court cannot conclude that Defendant has shown "a reasonable probability that the outcome of the trial would have been different had the government disclosed the information earlier." *United States v. Ahrensfield*, 698 F.3d 1310, 1319 (10th Cir. 2012) (cleaned up). The materiality inquiry requires this Court to determine whether the "evidence's significance in relation to the record as a whole would cause it to shake [the Court's] confidence in the guilty verdict." *Dermen*, 143 F.4th at 1201 (cleaned up). This bar is not met here. As mentioned above, the Court permitted defense counsel to re-call Special Agent Hammer on Monday, November 24 to question him about the email thread. [Nov. 24 Trial Tr. at 158:23–167:23]. Among other things, defense counsel elicited testimony from Special Agent Hammer that (1) Special Agent Harris asked him to review location data for certain time periods on August 13, August 14, and September 15, 2023, [*id.* at 161:22–162:13]; and

31

(2) his report did not include a timing advance summary for any of those dates, [*id.* at 161:8–21]. And during closing arguments, defense counsel highlighted this lack of data:

> The FBI CAST team cannot put Dylan Miller where Olivia claims he is on August 13, August 14, or September 15th. Hammer did no timing advance summary for Olivia's device and its whereabouts—huge problem, huge hole in this case. Agent Harris over here asked [Special Agent Hammer] to analyze specifically the dates of August 13, August 14, September 15, and September 15 matters because Ashley claims that that stalking road rage incident happened on the day that Loveland High played Thompson [Valley High School, and] Thompson beat Loveland High for the first time in 18 years; Ashley remembers that. So we don't know actually based on the testimony when this alleged stalking happened but [when] they look at those dates, meaning when Hammer does—their expert—they don't find Mr. Miller present at Olivia's softball practice, at the intersection where the alleged stalking happened, and they didn't include that very important evidence of innocence in Hammer's report . . . . They didn't [put it] in the report because we got it and that evidence doesn't fit their evidence of prosecution—that is, because Mr. Miller was not stalking Olivia.

[Dec. 1 Trial Tr. at 46:16–47:14].

To explain how potential cross-examination on Friday, November 21 would have been different had the defense had a copy of the email thread, Defendant asserts that Special Agent Harris had time to prepare for the re-cross-examination, "which he would not have had the time or opportunity to do had the email string been disclosed before his testimony." [Doc. 212 at 14 (emphasis omitted)]. However, the Court did not order the Government to make Special Agent Hammer available for additional cross-examination until approximately 12:00 p.m. on Monday, November 24. [Nov. 24 Trial Tr. at 111:3–10]. Special Agent Hammer took the stand for re-cross-examination at approximately 2:10 that same day. [*Id.* at 158:9–22]. The Court is respectfully not persuaded that this two-hour gap gave Special Agent Hammer significant opportunity prepare for defense counsel's questions. Defense counsel was still able to question Special Agent Hammer about the

32

email thread and the lack of data for those three dates, and counsel was able to rely on that line of questioning in arguing that the lack of data weakened the Government's case.

Because Defendant has not demonstrated a reasonable probability that earlier disclosure would have affected the outcome of the trial, the Court finds that he has not met his burden to establish a *Brady* violation.  *Cf. Ahrensfield*, 698 F.3d at 1320 (finding that defendant failed to show outcome of trial would have been different where the defendant was permitted to immediately re-call witness for further cross-examination); *cf. United States v. Cordova*, 25 F.4th 817, 826 (10th Cir. 2022) (affirming denial of motion for new trial based on *Brady* where the defendant was permitted to re-cross witness, which "weakened the [witness's] testimony").

Finally, Defendant argues that a text message exchanged between Special Agent Harris and Special Agent Hammer amount to "blatant prosecutorial misconduct and misconduct by government witnesses that justifies vacating the verdict and granting a new trial in the interest of justice."  [Doc. 212 at 15].  The morning of November 24, presumably during or close-in-time to the Court's discussion of Defendant's oral *Brady* motion, Special Agent Harris and Special Agent Hammer engaged in the following conversation:

> Special Agent Harris:  Hey dude I hate to bother you but I need to see if you might be able to get on a flight to Denver to be here tonight
>
> Special Agent Harris:  Defense is seeking to dismiss case based on CAST stuff
>
> Special Agent Harris:  can't talk will hit you up when I can
>
> Special Agent Harris:  Issue with the fact that there was no analysis for 9/15/23 in your report
>
> Special Agent Hammer:  Why would that be an issue

> Special Agent Hammer:  So we actually just hit the road to Alabama so I'm
> still basically in town
>
> Special Agent Hammer:  What's the ask
>
> Special Agent Hammer:  And is there any way to get it knocked out today
> as opposed to tomorrow

[Doc. 212 at 15]; *see also* [Doc. 212-11].

Defendant's prosecutorial-misconduct argument does not cite any legal authority, apply any appreciable legal standards, or contain meaningful analysis. *See* [Doc. 212 at 5]. By not identifying any legal framework through which the Court can review this assertion, Defendant has waived any argument related to prosecutorial misconduct with respect to the text message exchange. *Cooper*, 654 F.3d at 1128 (deeming "inadequately briefed" arguments waived (quotation omitted)).

The Court has reviewed the evidence both separately and cumulatively, assessing its utility to the defense and its potentially damaging impact to the prosecution's case, *Fontenot*, 4 F.4th at 1080, and finds that any withheld evidence does not rise to the level of a constitutional violation. For all of the reasons stated in this Order, Defendant has not demonstrated that a new trial is warranted. The Motion for New Trial is respectfully **DENIED**.

## CONCLUSION

Accordingly, **IT IS ORDERED** that:

(1)    Dylan Miller's Motion for Judgment of Acquittal [Doc. 211] is **DENIED**; and

(2)    Dylan Miller's Motion for a New Trial [Doc. 212] is **DENIED**.


DATED:  April 10, 2026                    BY THE COURT:

                                          _____
                                          Nina Y. Wang
                                          United States District Judge